**ALLIANCE ASSURANCE COMPANY,
Ltd., Plaintiff-Appellant,**

v.

**UNITED STATES of America,
Defendant-Appellee.**

**No. 110, Docket 24521.**

United States Court of Appeals Second Circuit.

Argued Dec. 5, 1957.

Decided Feb. 10, 1958.

---

James H. Simonson, New York City (Bigham, Englar, Jones & Houston, New York City, on the brief), for plaintiff-appellant, Alliance Assur. Co., Limited.

Foster Bam, Asst. U. S. Atty., Southern District of New York, New York City (Paul W. Williams, U. S. Atty., for Southern District of New York, Benjamin T. Richards, Jr., Asst. U. S. Atty., Southern District of New York, New York City, on the brief), for defendant-appellee, United States of America.

Before CLARK, Chief Judge, MOORE, Circuit Judge, and SMITH, District Judge.

MOORE, Circuit Judge.

This is a suit brought against the United States by Alliance Assurance Company, Ltd., the insurer and subrogee of Carlyle Clothes, Inc., to recover the value of goods, consigned to H. W. Robinson & Co., Inc., customs broker for Carlyle and the importer of record, which, while being inspected for entry into this country, disappeared from the possession of the United States Customs.

Two causes of action were alleged: (1) under the Tucker Act, 28 U.S.C.A. § 1346 (a)(2), for breach of an implied contract of bailment; and (2) under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), for the negligent loss of the goods.

### The Facts

In the cargo discharged from the S.S. Queen Mary at Pier 90, North River, New York, N.Y., in late December 1952 was a case of English woolens weighing 309 pounds imported by the H. W. Robinson & Co., Inc., a licensed customs broker for consignment to Carlyle Clothes. The stipulated value of the goods was $2,460.59. The appropriate entry procedure was followed and $708.25 duty was paid. The Invoice Division at the Custom House prepared ten so-called "Elliott Fisher" tickets containing identifying information, five of which were forwarded to the Appraiser at Public Stores and five delivered to the importer. Pursuant to statutory requirements (19 U.S.C.A. § 1499), on January 13, 1953 the goods were removed to Public Stores, 201 Varick Street, New York, N. Y. (the official government warehouse), for inspection by the customs officials to ascertain if the goods were of the value and quantity declared in the invoice.

On that date the goods were taken to the fifth floor of Public Stores, an inspection section, where the case was opened by a verifier and checked by an examiner. The goods passed inspection and presumably were repacked by the verifier and transferred to the "passed pile" of goods on that floor. The examiner then prepared a delivery order, consisting of two of the tickets, a white and a red,

which were placed in a post office type box reserved for H. W. Robinson & Co., Inc. on the first floor at Public Stores. An employee of the importer then endorsed the white ticket and turned both tickets over to its trucking company which at 4:19 p.m. on the same day, January 13, 1953, surrendered the red ticket to the customs officials to obtain delivery. Since the delivery platform closed at 4:30 p.m., the customs officials would not deliver the goods that day. The red ticket was sent back up to the fifth floor which under prescribed procedure operated as a notice to send the goods down to the delivery platform. The red ticket should have been filed on the fifth floor thus indicating that the goods had been sent to the first floor platform for delivery to the consignee. On the following day, the customs officials were unable to locate the goods to make delivery. On January 21, 1953, a full week after the disappearance, a search throughout Public Stores failed to uncover the goods. Thereafter the duty paid was refunded.

The trial court had no alternative but to find, and in fact did find, that the goods disappeared from the Public Stores and that "the manner in which they have vanished remains a mystery" (146 F. Supp. 118, 123).

### Jurisdiction

The United States made a motion to dismiss both causes of action for lack of jurisdiction over the subject matter. The trial court granted the motion to dismiss the claim under the Tucker Act, but denied the motion in so far as it sought to dismiss the claim under the Federal Tort Claims Act.

The trial court dismissed the cause of action under the Tucker Act "for lack of jurisdiction because it is not based on an express or implied contract within the meaning of the Act." The court, however, held that the government was subject to suit under the Tort Claims Act and that 28 U.S.C.A. § 2680(c) excepting any claim in respect of "the detention of any goods or merchandise by any officer of customs" from that Act did not bar

plaintiff's claim because customs could not detain goods which had disappeared. Judgment was entered for the government, the court concluding that "[P]laintiff has failed to prove that the customs officials were negligent in the handling of the case of woolen goods, * * *."

### The Cause of Action Under the Tucker Act

The Tucker Act provides in relevant part:

"(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

* * * * * *

"(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded * * * upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

■ The "implied" contracts on which an action may be brought under the Tucker Act are limited to contracts implied in fact as opposed to contracts implied in law, more commonly termed quasi-contracts. Keifer & Keifer v. Reconstruction Finance Corporation, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784; United States v. Minnesota Mutual Investment Co., 271 U.S. 212, 46 S.Ct. 501, 70 L.Ed. 911; Merritt v. United States, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643. The jurisdictional issue depends upon whether the bailment was a contract implied in fact, and if so, the terms of that contract. It, therefore, becomes necessary to analyze what, if any, contractual attributes a bailment of the type here involved possesses.

The obligation of the government was not artificially created by law but rather stemmed from an implied promise to redeliver the goods as soon as customs had checked them against the invoice. Such a promise need not be formalized in a written agreement or even made the subject of a specific conversation. It arises from the implied promise to return the goods to the lawful owner after the customs inspection has been completed. The elaborate set of ten tickets, at least two of which are designed to restore the goods to the owner, is indicative of this promise.

■■■ The government does not contend that the bailment here was "involuntary" in the sense that the goods were thrust upon it. Since it voluntarily undertook a bailment of the goods in question, a promise on its part to use due care during the term of the bailment can and should be implied. In the ordinary bailment "the mutual rights of the parties are often, if not usually, so inadequately fixed by their agreement, that rules of law not based on the agreement, although not inconsistent with it, must be called upon to supply the deficiency." Williston on Contracts, § 1032. It would be the normal and expected action on the part of the bailee to promise to use due care, and no judicial inventiveness is required to imply one. It is at least as reasonable to imply such a promise here as it is to imply a promise by the government to pay for lands it has tortiously appropriated as was done in United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (alternative holding), and United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539. The government's attempt to distinguish the case at bar from the Lynah case by arguing that some "unforeseeable factor such as theft was present in this case whereas in the 'taking' cases the government was or could have been aware that the plaintiff's injuries would flow directly from its actions" contains its own rebuttal because in this case it can only be held for injuries which were reasonably foreseeable from its breach of its promise to use due care.

Nor does absence of any specific bailment fee weaken the promise or deprive the implied agreement of consideration. This appears to have been the rule for many years. In Wheatley v. Low, Cro. Jac. 668, 79 Eng.Reprint 578 (K.B. 1623), the defendant without compensation accepted money from the plaintiff and promised to deliver it to a certain

person. Upon his failure to do so, the defendant suffered an unfavorable verdict in an action of special assumpsit. A motion in arrest of judgment on the ground that there was no consideration was denied "for being that he accepted this money to deliver, and promised to deliver it, it is a good consideration to charge him." In *Coggs v. Bernard*, 2 Ld.Raym. 909, 92 Eng.Reprint 107 (1703), a gratuitous bailee damaged some casks of brandy which he was transporting and was held liable for his negligent handling. Lord Holt in holding that there was consideration underlying the bailee's gratuitous undertaking said in the course of his opinion (2 Ld.Raym. 919, 92 Eng.Reprint 113):

> "But secondly it is objected, that there is no consideration to ground this promise upon, and therefore the undertaking is but nudum pactum. But to this I answer, that the owner's trusting him with the goods is a sufficient consideration to oblige him to a careful management."

The doctrine that a gratuitous bailment is supported by consideration has retained its vitality down through modern times. See *First Nat. Bank of Lyons v. Ocean Nat. Bank*, 60 N.Y. 278, 284–285; *Glanzer v. Shepard*, 233 N.Y. 236, 239–240, 135 N.E. 275, 23 A.L.R. 1425; *Siegel v. Spear & Co.*, 234 N.Y. 479, 483, 138 N.E. 414, 416, 26 A.L.R. 1205. In *Siegel v. Spear & Co.*, supra, Judge Crane, in holding that a gratuitous undertaking was an enforceable contract, observed:

> "In the case of *Rutgers v. Lucet*, 2 Johns.Cas. 92, 95, the law on this point was stated to be as follows: 'A mere agreement to undertake a trust, *in futuro*, without compensation, it is true, is not obligatory; but when once *undertaken*, and the trust actually *entered upon*, the bailee is bound to perform it, according to the terms of his agreement. The confidence placed in him, and his undertaking to execute the trust, raise a sufficient consideration; a contrary doctrine would tend to injure and de-

ceive his employer, who might be unwilling to consent to the bailment on any other terms.'"

A more compelling reason to find consideration exists here because the bailment, although gratuitous, was compulsory and for the exclusive benefit of the bailee, whereas in the cases above cited the bailment was for the benefit of the bailor.

*C. F. Harms Co. v. Erie R. Co.*, 2 Cir., 1948, 167 F.2d 562, presents a somewhat analogous situation. There the charterer of a barge under orders to deliver a shipment of "half-tracks" to the Army at a pier in Weehawken, N. J., left the barge with the "half-tracks" aboard at the assigned pier. There was no express contract allowing the government to use the barge or defining the terms and scope of the government's possession and control of the barge. The barge became damaged in a storm and the charterer was allowed to bring an action for liability under the Tucker Act "as a bailee under a contract implied in fact." In his opinion Judge Learned Hand noted that "it [the charterer] had the choice either of refusing to deliver the 'half-tracks' at all, or of trusting to such protection as the Army might give." 167 F.2d 564. Likewise here the bailor had the choice of either electing not to ship the goods into this country or of relying upon such protection as the custom officials chose to give the goods.

The first cause of action was properly brought under the Tucker Act.

### The Federal Tort Claims Act

█ The action is also properly brought under the Federal Tort Claims Act. The government strongly urges that the exception to that Act found in 28 U.S.C.A. § 2680(c) bars such a claim and contends that a "detention" as used therein encompasses not only a refusal to deliver goods admittedly in the possession of customs authorities but a loss of goods formerly in their possession. Here the goods had disappeared and a search of the eight divisions of Public Stores revealed that they were no longer in the

possession of the customs authorities. In theory, at least, in order to detain, one must possess something to detain. The probable purpose of the exception was to prohibit actions for conversion arising from a denial by the customs authorities or other law enforcement agencies of another's immediate right of dominion or control over goods in the possession of the authorities. An examination of the cases in which the exception was asserted reveals that it is normally used to bar actions based upon the illegal seizure of goods. See, e.g., Jones v. Federal Bureau of Investigation, D.C., 139 F.Supp. 38, 39; United States v. One 1951 Cadillac Coupe De Ville, D.C., 125 F.Supp. 661. That the exception does not and was not intended to bar actions based on the negligent destruction, injury or loss of goods in the possession or control of the customs authorities is best illustrated by the fact that the exception immediately preceding it expressly bars actions "arising out of the loss, miscarriage, or negligent transmission" of mail. 28 U.S.C.A. § 2680(b). If Congress had similarly wished to bar actions based on the negligent loss of goods which governmental agencies other than the postal system undertook to handle, the exception in 28 U.S.C.A. § 2680(b) shows that it would have been equal to the task. The conclusion is inescapable that it did not choose to bestow upon all such agencies general absolution from carelessness in handling property belonging to others. Nakasheff v. Continental Ins. Co., D.C., 89 F.Supp. 87, reaching a contrary result, was based in large measure on regulations of the Bureau of Customs but such regulations cannot override the clear wording of the statute.

### The Burden of Proof

██ Once the basic fact of loss has been established, there is a presumption of negligence against the bailee. In applying the presumption it is necessary to decide whether the burden of persuasion as well as the burden of coming forward is shifted to the bailee. Since the loss as well as the transaction preceding it occurred in New York, the law of that forum should be applied here.

New York law is well stated in Dalton v. Hamilton Hotel Operating Co., Inc., 242 N.Y. 481, 485, 152 N.E. 268. There the plaintiff stored two trunks in the basement of an apartment hotel while waiting for her apartment to become available. The bailment was gratuitous. When the plaintiff demanded the trunks they could not be found. The defendant, as here, "gave evidence to the effect that it had adopted a system covering the storage of baggage like that which prevailed in other similar buildings and under which articles were to be stored in the room above mentioned where they were under the custody and watch at all times of reliable employees." The court held (242 N.Y. at page 488, 152 N.E. at page 270):

> "When plaintiff demanded that her trunks be delivered to her at her apartment and the defendant failed to do this, a *prima facie* case was established against the latter even of gross negligence which amounted to a breach of its obligations and which called for an explanation. Canfield v. Baltimore & Ohio R. R. Co., 93 N.Y. 532; Hasbrouck v. New York C. & H. R. R. R. Co., 202 N.Y. 363, 373, 374, 95 N.E. 808, 35 L.R.A., N.S., 537. And we do not think that defendant made such explanation as rebutted the presumption and destroyed the *prima facie* case. It attempted to do this by giving evidence of a system under which trunks were placed in a room under the constant watchfulness of competent and reliable employees. As a matter of fact there is no evidence that the plaintiff's trunks ever came within the operation of this system, for they were traced no further than to show that they were taken to the basement of the apartment house. But if we assume that the trunks were placed in the proper depository under the watchfulness provided by the defendant, we do not think that this fact answers the presumption aris-

ing in favor of plaintiff on failure to deliver her trunks or satisfactorily explains their disappearance. Presumptively under this system the trunks should have been in defendant's possession and ready for delivery when called for, and it is the failure of what was to be expected that defendant is called on to explain."

This being the New York law, an *a fortiori* situation should exist where the bailment, as here, was compulsory. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89, reaffirming by a 5–4 majority a previous decision of an evenly divided court in 313 U.S. 541, 61 S.Ct. 840, 85 L.Ed. 1510, aside from the fact that it did not construe New York law, is distinguishable. There the court was concerned with a voluntary bailment inuring in part to the benefit of the bailor. Here the bailor had no choice of the place of bailment, of the duration of the bailment, or of the bailee. The government took his property for the purpose of assessing the correct amount of duty. For the same reason the test in Fidelity & Guaranty Ins. Corp. v. Ballon, 280 App.Div. 373, 113 N.Y.S.2d 546, is also inapposite.

Where the basic fact—here disappearance of the goods—has strong evidentiary value and where, as here, strong policy reasons exist for requiring an explanation by the party against whom the presumption is applied, the trend has been to shift the burden of persuasion as well as the burden of coming forward. Thus Rule 14 of the Uniform Rules of Evidence, approved in 1953 by the American Bar Association, dealing with the effect of presumptions, provides that "if the facts from which the presumption is derived have any probative value as evidence of the existence of the presumed fact, the presumption continues to exist and the burden of establishing the nonexistence of the presumed fact is upon the party against whom the presumption operates."

In arguing that presumptions in general should have the effect of shifting the burden of persuasion, Morgan in his article, Presumptions and Burden of Proof, 47 Harv.L.Rev. 59, singles out the bailment situation for particular emphasis. He observes (pp. 79–80):

"Some presumptions the courts have created because the evidence which will establish the fact is peculiarly accessible to one of the parties. Thus, where a chattel in good condition is entrusted to a bailee for hire and he delivers it in bad condition to his bailor, the damage is presumed to have been caused by the bailee's negligence. 'The goods are entrusted to him. He has charge and control of them. He determines the manner of keeping them. He is in possession of such evidence as there is as to the circumstances attending the loss.' Is it reasonable to permit the presumption to be destroyed by the mere production of testimony which would justify a trier in finding due care but which in fact has no tendency to persuade the particular trier that such care has been used? It is true that in judicial discussions of rules of evidence and procedure the dangers of perjury and the supposed efficacy of legal rules to prevent it are greatly overemphasized. Still, is it not true that a doctrine which allows a party to escape liability by merely producing evidence regardless of its actual convincing power is a real incentive to perjury?"

The bailee should bear the burden of persuasion. Gardner v. Jonathan Club, 35 Cal.2d 343, 217 P.2d 961; Redfoot v. J. T. Jenkins Co., 138 Cal.App.2d 108, 291 P.2d 134; Downey v. Martin Aircraft Service, 96 Cal.App.2d 94, 214 P.2d 581; Jacques v. City Parking Service, La.App., 97 So.2d 78; Buckey v. Indianhead Truck Line, 234 Minn. 379, 48 N.W.2d 534. The government in this case is in a position of public trust at least equal to that of common carriers which uniformly must discharge both burdens. Uniform Bills of Lading Act § 12; 49 U.S.C.A. § 88. The goods here were in

the exclusive custody and control of the defendant; the circumstances under which the goods were handled were within only its knowledge. Upon it should rest the burden of establishing by a preponderance of the evidence that the loss was probably caused by some event beyond its control such as an unpreventable fire, theft or other circumstance more consistent with due care rather than negligence.

Accepting the finding made by the trial court that the loss was unexplained, the government failed to discharge its burden of showing that it was not negligent. With the exception of the examiner, the defendant called none of the employees charged with the duty of actually processing the goods in the Public Stores. There was no testimony from the verifier on the fifth floor whose responsibility it was to repack the case and place it in the "passed pile," none from the guard who was charged with caring for the "passed pile," none from the officer who should have received the red ticket and thereupon taken the goods from the "passed pile" onto the elevator, none from the elevator operator who would have taken the goods down to the first floor, and none from the guards and officers on the delivery platform. Nor was the red ticket which should have been filed on the fifth floor prior to the goods being sent down to the first floor introduced in evidence.

■ The government did no more than establish general prudent procedure analogous to offering evidence of careful manufacturing processes to show that a ' particular piece of merchandise could not have been defective or to prove a regular business routine to establish that a letter was mailed; but this was not the issue. There was no question that the goods were not delivered. Proof of a course of business was not sufficient to rebut the presumption against the government. Murphy v. Co-op Laundry Co., 230 Minn. 213, 41 N.W.2d 261; Dalton v. Hamilton Hotel Operating Co., Inc., supra. The government did no more than attempt to establish what already was conceded before the trial, namely, to use the language of the trial court, "that the cause of loss was a mystery." The government cannot avoid liability for the loss by showing that it does not usually lose the goods it handles under routine procedures.

The judgment is reversed and remanded with instructions to enter judgment for the plaintiff.