# KOSAK *v.* UNITED STATES

No. 82–618.   Argued November 7, 1983—Decided March 21, 1984

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined.   STEVENS, J., filed a dissenting opinion, *post,* p. 862.

*Jeffrey L. Naftulin* argued the cause and filed a brief for petitioner.

*Kathryn A. Oberly* argued the cause for the United States. With her on the brief were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Geller,* and *Marc Richman.*

JUSTICE MARSHALL delivered the opinion of the Court.

The question presented in this case is whether 28 U. S. C. § 2680(c), which exempts from the coverage of the Federal Tort Claims Act "[a]ny claim arising in respect of . . . the detention of any goods or merchandise by any officer of customs," precludes recovery against the United States for injury to private property sustained during a temporary detention of the property by the Customs Service.

## I

While a serviceman stationed in Guam, petitioner assembled a large collection of oriental art. When he was transferred from Guam to Philadelphia, petitioner brought his art collection with him. In his customs declaration,[1] petitioner stated that he intended to keep the contents of the collection for himself. Subsequently, acting upon information that, contrary to his representations, petitioner planned to resell portions of his collection, agents of the United States Customs Service obtained a valid warrant to search petitioner's house. In executing that warrant, the agents seized various antiques and other objects of art.

Petitioner was charged with smuggling his art collection into the country, in violation of 18 U. S. C. § 545. After a jury trial, he was acquitted. The Customs Service then notified petitioner that the seized objects were subject to civil forfeiture under 19 U. S. C. § 1592, which at the time permitted confiscation of goods brought into the United States "by

---

[1] Because Guam is outside the customs territory of the United States, all goods imported therefrom are subject to duties. 19 U. S. C. § 1202.

means of any false statement." Relying on 19 U. S. C. § 1618, petitioner filed a petition for relief from the forfeiture.[2] The Customs Service granted the petition and returned the goods.

Alleging that some of the objects returned to him had been injured while in the custody of the Customs Service, petitioner filed an administrative complaint with the Service requesting compensation for the damage. The Customs Service denied relief. Relying on the Federal Tort Claims Act, 28 U. S. C. §§ 1346(b), 2671–2680 (1976 ed. and Supp. V), petitioner then filed suit in the United States District Court for the Eastern District of Pennsylvania, seeking approximately $12,000 in damages for the alleged injury to his property.[3] The Government moved for a dismissal of the complaint or for summary judgment on the ground that petitioner's claim was barred by § 2680(c). The District Court granted the Government's motion.[4]

---

[2] Section 1618 permits the Secretary of the Treasury to remit or mitigate a forfeiture "if he finds that such . . . forfeiture was incurred without willful negligence or without any intention on the part of the petitioner to defraud the revenue or to violate the law, or finds the existence of such mitigating circumstances as to justify the remission or mitigation of such . . . forfeiture . . . ."

[3] Petitioner also requested damages for two other alleged injuries related to the seizure and detention of his property: the destruction of a cork pagoda by customs officials during the search of petitioner's house, and the accidental seizure of a sales receipt for a stereo receiver (without which petitioner was unable to obtain warranty repairs). App. 6–7. In his brief, petitioner argues that these two claims are segregable from his primary claim for damages resulting from the injury to the detained goods and merit separate analysis. Because petitioner did not present this argument to the Court of Appeals, we decline to consider it. See *United States* v. *Lovasco*, 431 U. S. 783, 788, n. 7 (1977).

[4] Civil Action No. 81–2054 (ED Pa. Oct. 15, 1981). The District Court did not identify the grounds for its ruling. We see no reason to doubt the inference drawn by the Court of Appeals that the District Court was persuaded by the Government's argument that § 2680(c) barred the suit. 679 F. 2d 306, 307, and n. 2. It would have been better practice, however, for the District Court to have noted the reasons for its judgment.

The Court of Appeals, with one judge dissenting, affirmed. 679 F. 2d 306 (CA3 1982). The Court of Appeals reasoned that the United States may be held liable for torts committed by its employees only on the basis of a statutory provision evincing a "'clear relinquishment of sovereign immunity.'" *Id.*, at 309 (quoting *Dalehite* v. *United States,* 346 U. S. 15, 31 (1953)). In the court's view, the Federal Tort Claims Act, as qualified by § 2680(c), fails to provide the necessary relinquishment of governmental immunity from suits alleging that customs officials damaged or lost detained property. On the contrary, the court observed, the "clear language" of § 2680(c) shields the United States from "all claims arising out of detention of goods by customs officers and does not purport to distinguish among types of harm." 679 F. 2d, at 308. On that basis, the Court of Appeals held that petitioner had failed to state a claim on which relief could be granted.

We granted certiorari to resolve a conflict in the Circuits regarding the liability of the United States for injuries caused by the negligence of customs officials in handling property in their possession.[5] 459 U. S. 1101 (1983). We now affirm.

## II

## A

The Federal Tort Claims Act, enacted in 1946, provides generally that the United States shall be liable, to the same extent as a private party, "for injury or loss of property, or

---

[5] In three cases, Courts of Appeals have construed § 2680(c) in ways that would not bar petitioner's suit. *A & D International, Inc.* v. *United States,* 665 F. 2d 669 (CA5 1982); *A-Mark, Inc.* v. *United States Secret Service,* 593 F. 2d 849 (CA9 1978); *Alliance Assurance Co.* v. *United States,* 252 F. 2d 529 (CA2 1958). In two other cases, Courts of Appeals have read the provision as did the Third Circuit in this case. *United States* v. *One (1) Douglas A–26B Aircraft,* 662 F. 2d 1372 (CA11 1981); *United States* v. *One (1) 1972 Wood, 19 Foot Custom Boat, FL 8443 AY,* 501 F. 2d 1327 (CA5 1974). In *Hatzlachh Supply Co.* v. *United States,* 444 U. S. 460, 462, n. 3 (1980), we acknowledged the divergence in the views of the Circuits but expressly declined to decide the issue.

personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U. S. C. § 1346(b); see also 28 U. S. C. § 2674. The Act's broad waiver of sovereign immunity is, however, subject to 13 enumerated exceptions. 28 U. S. C. §§ 2680(a)–(f), (h)–(n). One of those exceptions, § 2680(c), exempts from the coverage of the statute "[a]ny claim arising in respect of . . . the detention of any goods or merchandise by any officer of customs . . . ."[6] Petitioner asks us to construe the foregoing language to cover only claims "for damage caused by the detention itself and not for the negligent . . . destruction of property while it is in the possession of the customs service." By "damage caused by the detention itself," petitioner appears to mean harms attributable to an illegal detention, such as a decline in the economic value of detained goods (either because of depreciation or because of a drop in the price the goods will fetch), injury resulting from deprivation of the ability to make use of the goods during the period of detention, or consequential damages resulting from lack of access to the goods.[7] The Government asks us to read the

---

[6] The full text of § 2680(c) provides:

"The provisions of [28 U. S. C. §§ 2671–2679] and section 1346(b) of this title shall not apply to—

.        .        .        .        .

"(c) Any claim arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods or merchandise by any officer of customs or excise or any other law-enforcement officer."

We have no occasion in this case to decide what kinds of "law-enforcement officer[s]," other than customs officials, are covered by the exception.

[7] In view of the fact that the Tort Claims Act permits recovery only of "money damages . . . for injury or loss of property, or personal injury or death," 28 U. S. C. § 1346(b), it is unclear whether, even in the absence of § 2680(c), any of the foregoing sorts of damage would be recoverable under the Act. Cf., e. g., Idaho ex rel. Trombley v. United States Dept. of Army, Corps of Engineers, 666 F. 2d 444 (CA9) (adopting a restrictive

exception to cover all injuries to property sustained during its detention by customs officials.[8]

The starting point of our analysis of these competing interpretations must, of course, be the language of § 2680(c). "[W]e assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'" *American Tobacco Co.* v. *Patterson*, 456 U. S. 63, 68 (1982) (quoting *Richards* v. *United States*, 369 U. S. 1, 9 (1962)).[9] At first blush,

---

interpretation of the language of § 1346(b)), cert. denied, 459 U. S. 823 (1982). If the sorts of damages that, under petitioner's theory, are covered by § 2680(c) would not be recoverable in any event because of the limitation built into § 1346(b), § 2680(c) would be mere surplusage. The unattractiveness of such a construction of the statute, see *Colautti* v. *Franklin*, 439 U. S. 379, 392 (1979), would cast considerable doubt on petitioner's position. However, because the question of the scope of § 1346(b) has not been briefed or argued in this case, we decline to rely on any inferences that might be drawn therefrom in our decision today.

[8] Because petitioner conceded below that the injuries to his property occurred after it had been lawfully detained by customs officers, we need not consider the meaning of the term "detention" as used in the statute.

[9] The Court of Appeals, while properly emphasizing the plain language of § 2680(c) as the basis for its ruling, suggested that the structure of the Tort Claims Act should affect how that language is read. Relying on the principles that "sovereign immunity is the rule, and that legislative departures from the rule must be strictly construed," the Court of Appeals suggested that § 2680(c), as an exception from a statute waiving sovereign immunity, should be broadly construed. 679 F. 2d, at 308–309. We find such an approach unhelpful. Though the Court of Appeals is certainly correct that the exceptions to the Tort Claims Act should not be read in a way that would "'nullif[y them] through judicial interpretation,'" *id.*, at 309, unduly generous interpretations of the exceptions run the risk of defeating the central purpose of the statute. See *United States* v. *Yellow Cab Co.*, 340 U. S. 543, 548, n. 5 (1951); cf. *Block* v. *Neal*, 460 U. S. 289, 298 (1983) ("'The exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced'") (quoting *Anderson* v. *Hayes Construction Co.*, 243 N. Y. 140, 147, 153 N. E. 28, 29–30 (1926) (Cardozo, J.)). We think that the proper objective of a court attempting to construe one of the subsections of 28 U. S. C. § 2680 is

the statutory language certainly appears expansive enough to support the Government's construction; the encompassing phrase, "arising in respect of," seems to sweep within the exception all injuries associated in any way with the "detention" of goods. It must be admitted that this initial reading is not ineluctable; as Judge Weis, dissenting in the Court of Appeals, pointed out, it is possible (with some effort) to read the phrase, "in respect of" as the equivalent of "as regards" and thereby to infer that "the statutory exception is directed to the fact of detention itself, and that alone." 679 F. 2d, at 310. But we think that the fairest interpretation of the crucial portion of the provision is the one that first springs to mind: "any claim arising in respect of" the detention of goods means any claim "arising out of" the detention of goods, and includes a claim resulting from negligent handling or storage of detained property.

Relying on the analysis of the Second Circuit in *Alliance Assurance Co.* v. *United States*, 252 F. 2d 529 (1958), petitioner argues that the foregoing reading of the plain language of § 2680(c) is undercut by the context in which the provision appears.

> "That the exception does not and was not intended to bar actions based on the negligent destruction, injury or loss of goods in the possession or control of the customs authorities is best illustrated by the fact that the exception immediately preceding it expressly bars actions 'arising out of the loss, miscarriage, or negligent transmission' of mail. 28 U. S. C. A. § 2680(b). If Congress had similarly wished to bar actions based on the negligent loss of goods which governmental agencies other than the postal system undertook to handle, the exception in 28 U. S. C. A. § 2680(b) shows that it would have been equal to the task. The conclusion is inescapable that it

to identify "those circumstances which are within the words and reason of the exception"—no less and no more. See *Dalehite* v. *United States*, 346 U. S. 15, 31 (1953).

did not choose to bestow upon all such agencies general absolution from carelessness in handling property belonging to others." *Id.*, at 534.[10]

We find the conclusion reached by petitioner and the Second Circuit far from "inescapable." The specificity of §2680(b), in contrast with the generality of §2680(c), suggests, if anything, that Congress intended the former to be *less* encompassing than the latter. The motivation for such an intent is not hard to find. One of the principal purposes of the Federal Tort Claims Act was to waive the Government's immunity from liability for injuries resulting from auto accidents in which employees of the Postal System were at fault.[11] In order to ensure that §2680(b), which governs torts committed by mailmen, did not have the effect of barring precisely the sort of suit that Congress was most concerned to authorize, the draftsmen of the provision carefully delineated the types of misconduct for which the Government was not assuming financial responsibility—namely, "the loss, miscarriage, or negligent transmission of letters or postal matter"—thereby excluding, by implication, negligent handling of motor vehicles. The absence of any analogous desire to limit the reach of the statutory exception pertaining to the detention of property by customs officials explains the lack of comparable nicety in the phraseology of §2680(c).

### B

The legislative history of §2680(c), though meager, supports the interpretation of the provision that we have derived from its language and context. Two specific aspects of the evolution of the provision are telling. First, the person who

---

[10] For reiterations of this argument, see *A & D International, Inc.* v. *United States*, 665 F. 2d, at 672; *A-Mark, Inc.* v. *United States Secret Service*, 593 F. 2d, at 850.

[11] See General Tort Bill: Hearing before a Subcommittee of the House Committee on Claims, 72d Cong., 1st Sess., 17 (1932) (testimony of Assistant Attorney General Rugg).

almost certainly drafted the language under consideration clearly thought that it covered injury to detained property caused by the negligence of customs officials. It appears that the portion of § 2680(c) pertaining to the detention of goods was first written by Judge Alexander Holtzoff, one of the major figures in the development of the Tort Claims Act. In his report explicating his proposals, Judge Holtzoff explained:

> "[The proposed provision would exempt from the coverage of the Act] [c]laims arising in respect of the assessment or collection of any tax or customs duty. This exception appears in all previous drafts. It is expanded, however, so as to include immunity from liability in respect of *loss in connection with the detention of goods or merchandise* by any officer of customs or excise. The additional proviso has special reference to the detention of imported goods in appraisers' warehouses or customs houses, as well as seizures by law enforcement officials, internal revenue officers, and the like." A. Holtzoff, Report on Proposed Federal Tort Claims Bill 16 (1931) (Holtzoff Report) (emphasis added).[12]

Though it cannot be definitively established that Congress relied upon Judge Holtzoff's report, it is significant that the

---

[12] Judge Holtzoff went on to explain that "[t]his provision is suggested in the proposed draft of the bill submitted by the Crown Proceedings Committee in England in 1927. . . ." Holtzoff Report, at 16. The relevant portion of the bill to which Holtzoff referred was even more explicit:

"No proceedings shall lie under this section—

. . . . .

"(c) for or in respect of the loss of or any deterioration or damage occasioned to, or any delay in the release of, any goods or merchandise by reason of anything done or omitted to be done by any officer of customs and excise acting as such . . . ." Report of Crown Proceedings Committee § 11(5)(c), pp. 17–18 (Apr. 1927). (It appears that this bill was never enacted into law in England.)

apparent draftsman of the crucial portion of § 2680(c) believed that it would bar a suit of the sort brought by petitioner.[13]

Second, the congressional Committees that submitted Reports on the various bills that ultimately became the Tort Claims Act suggested that the provision that was to become § 2680(c), like the other exceptions from the waiver of sovereign immunity, covered claims "arising out of" the designated conduct. Thus, for example, the House Judiciary Committee described the proposed exceptions as follows:

> "These exemptions cover claims arising out of the loss or miscarriage of postal matter; the assessment or collection of taxes or assessments; the detention of goods by customs officers; admiralty and maritime torts; deliberate torts such as assault and battery; and others." H. R. Rep. No. 1287, 79th Cong., 1st Sess., 6 (1945).[14]

The Committees' casual use of the words, "arising out of," with reference to the exemption of claims pertaining to the

---

[13] Mr. Holtzoff wrote his report while serving as Special Assistant to the Attorney General. He had been "assigned by Attorney General Mitchell to the special task of co-ordinating the views of the Government departments" regarding the proper scope of a tort claims statute. See Borchard, The Federal Tort Claims Bill, 1 U. Chi. L. Rev. 1, n. 2 (1933). Holtzoff submitted his report, in which his draft bill was contained, to Assistant Attorney General Rugg, who in turn transmitted it to the General Accounting Office of the Comptroller General. Insofar as Holtzoff's report embodied the views of the Executive Department at that stage of the debates over the tort claims bill, it is likely that, at some point, the report was brought to the attention of the Congressmen considering the bill. We agree with the dissent that, because the report was never introduced into the public record, the ideas expressed therein should not be given great weight in determining the intent of the Legislature. See *post*, at 863–864. But, in the absence of any direct evidence regarding how Members of Congress understood the provision that became § 2680(c), it seems to us senseless to ignore entirely the views of its draftsman.

[14] See also S. Rep. No. 1400, 79th Cong., 2d Sess., 33 (1946); S. Rep. No. 1196, 77th Cong., 2d Sess., 7 (1942); H. R. Rep. No. 2245, 77th Cong., 2d Sess., 10 (1942).

detention of goods substantially undermines petitioner's contention that the phrase, "in respect of," was designed to limit the sorts of suits covered by the provision.[15]

Of perhaps greater importance than these two clues as to the meaning of the prepositional phrase contained in § 2680(c) is the fact that our interpretation of the plain language of the provision accords with what we know of Congress' general purposes in creating exceptions to the Tort Claims Act.[16] The three objectives most often mentioned in the legislative history as rationales for the enumerated exceptions are: ensuring that "certain governmental activities" not be disrupted by the threat of damages suits; avoiding exposure of the United States to liability for excessive or fraudulent claims; and not extending the coverage of the Act to suits for which adequate remedies were already available.[17]

---

[15] Cf. 679 F. 2d, at 309 (Weis, J., dissenting) (discussed, *supra*, at 854).

[16] The dissent objects to our effort to test our interpretation of § 2680(c) for conformity with the legislative purposes that underlie § 2680 as a whole, principally on the ground that we take inadequate account of the "central purpose" of the Tort Claims Act. *Post*, at 866–869. The dissent mistakes the nature of our analysis. Our view is that the language of § 2680(c) is inclusive enough to exempt the United States from liability for negligence in the handling or storage of goods detained by the Customs Service, see *supra*, at 854. Our purpose in looking to the legislative history is merely to ensure that our construction is not undercut by any indication that Congress meant the exception to be read more narrowly. Because of the sparseness of the evidence regarding the purpose of § 2680(c) itself, see *supra*, at 855–858, we consider it advisable to consider Congress' more general objectives in excluding certain kinds of claims from the broad waiver of sovereign immunity effected by the Tort Claims Act. Because we find that our reading of § 2680(c) is consistent with those objectives, we see no need to throw our analytical net any wider.

[17] For a variety of expressions of these three purposes, see S. Rep. No. 1400, 79th Cong., 2d Sess., 33 (1946); Tort Claims: Hearings on H. R. 5373 and H. R. 6463 before the House Judiciary Committee, 77th Cong., 2d Sess., 33 (1942) (testimony of Assistant Attorney General Shea); Tort Claims Against the United States: Hearings on H. R. 7236 before Subcommittee No. 1 of the House Judiciary Committee, 76th Cong., 3d Sess., 22 (1940) (testimony of Alexander Holtzoff); Hearings, *supra* n. 11, at 17

The exemption of claims for damage to goods in the custody of customs officials is certainly consistent with the first two of these purposes. One of the most important sanctions available to the Customs Service in ensuring compliance with the customs laws is its power to detain goods owned by suspected violators of those laws.[18] Congress may well have wished not to dampen the enforcement efforts of the Service by exposing the Government to private damages suits by disgruntled owners of detained property.

Congress may also have been concerned that a waiver of immunity from suits alleging damage to detained property would expose the United States to liability for fraudulent claims. The Customs Service does not have the staff or resources it would need to inspect goods at the time it seizes them. Lacking a record of the condition of a piece of property when the Service took custody of it, the Government would be in a poor position to defend a suit in which the owner alleged that the item was returned in damaged condition.[19] Congress may have reasoned that the frequency with

---

(testimony of Assistant Attorney General Rugg); Holtzoff Report, at 15. To our knowledge, the only arguably relevant specific statement as to the purpose of § 2680(c) appears in the testimony of Alexander Holtzoff before a Subcommittee of the Senate Judiciary Committee. Holtzoff emphasized the adequacy of existing remedies as a justification for the portion of the provision pertaining to the recovery of improperly collected taxes; he did not proffer an explanation for the portion of the provision pertaining to the detention of goods. Tort Claims Against the United States: Hearings on S. 2690 before a Subcommittee of the Senate Committee on the Judiciary, 76th Cong., 3d Sess., 38 (1940).

[18] See, e. g., 19 U. S. C. § 1594 (authorizing seizure of "a vessel or vehicle" to force payment of assessed penalties); 19 U. S. C. § 1595a(a) (authorizing seizure of property used to facilitate the illegal importation of other goods).

[19] The Government's vulnerability to fraudulent claims would be especially great in a case in which the Customs Service took custody of the goods from a shipper rather than from the owner. The shipper would contend that it exercised due care in the handling of the goods. The owner would demonstrate that he received the goods in damaged condition. In the absence of an extensive system for accounting for the movements and

which the Government would be obliged to pay undeserving claimants if it waived immunity from such suits offset the inequity, resulting from retention of immunity, to persons with legitimate grievances.

To a lesser extent, our reading of § 2680(c) is consistent with the third articulated purpose of the exceptions to the Tort Claims Act. At common law, a property owner had (and retains) a right to bring suit against an individual customs official who negligently damaged his goods.[20] Title 28 U. S. C. § 2006 provides that judgments in such suits shall be paid out of the Federal Treasury if a court certifies that there existed probable cause for the detention of the goods and that the official was acting under the directions of an appropriate supervisor.[21] Congress in 1946 may have concluded that this mode of obtaining recompense from the United States (or from an individual officer) was "adequate."[22] To be sure, there are significant limitations to the common-law remedy, the most important of which is the apparent requirement that the plaintiff prove negligence on the part of a particular cus-

---

treatment of property in its custody, the Customs Service would be hard pressed to establish that its employees were not at fault. We do not suggest that such a dilemma would automatically give rise to liability on the part of the United States; that of course would depend upon the substance of the pertinent state tort law. See 28 U. S. C. §§ 1346(b), 2674. But uneasiness at the prospect of such scenarios may have influenced Congress when it carved out this exception to the Tort Claims Act.

[20] See, e. g., States Marine Lines, Inc. v. Shultz, 498 F. 2d 1146, 1149 (CA4 1974); Dioguardi v. Durning, 139 F. 2d 774, 775 (CA2 1944); J. Story, Commentaries on the Law of Bailments §§ 613, 618, pp. 387, 390 (1832).

[21] See States Marine Lines, Inc. v. Shultz, supra, at 1149–1150.

[22] We note that there exists at least one other remedial system that might enable someone in petitioner's position to obtain compensation from the Government. If the owner of property detained by the Customs Service were able to establish the existence of an implied-in-fact contract of bailment between himself and the Service, he could bring suit under the Tucker Act, 28 U. S. C. § 1491 (1976 ed., Supp. V). See Hatzlachh Supply Co. v. United States, 444 U. S. 460 (1980).

toms official.[23]  Such proof will often be difficult to come by. But Congress may well have concluded that exposing the United States to liability for injury to property in the custody of the Customs Service under circumstances in which the owner is not able to demonstrate such specific negligence would open the door to an excessive number of fraudulent suits.[24]

---

[23] At oral argument, the Government contended that a property owner could recover against the United States under this theory by bringing suit against the relevant District Director of the Customs Service and would not be obliged to prove negligence on the part of any specific customs official.  Tr. of Oral Arg. 28–29.  Though we do not decide the issue, such an interpretation of the common-law doctrine appears questionable to us. Except in cases in which the property owner could demonstrate that the Director expressly authorized tortious conduct by a subordinate, it seems likely that the owner would be obliged to identify and bring suit against the individual whose malfeasance caused the injury to his goods.

[24] The dissent finds "internally inconsistent" the foregoing "hypothetical rationales" for § 2680(c).  *Post*, at 865.  Thus, the dissent suggests that the fact that an owner of goods damaged by the Customs Service might recover from the United States under the Tucker Act, see n. 22, *supra*, makes it unlikely that Congress would have been chary of creating a remedy under the Tort Claims Act because of the risk of exposing the Government to an excessive number of fraudulent suits.  *Post*, at 865–866.  But the requirement that an owner, to recover under the Tucker Act, prove that the Service entered into an implied-in-fact contract of bailment would operate to screen out many fraudulent claims; Congress rationally could have concluded that, in view of the absence of any comparable filter in the Tort Claims Act, it was inadvisable to extend the coverage of the latter to owners of detained goods.  Similarly, the dissent finds it implausible that Congress might have feared that the creation of a remedy against the United States under the Tort Claims Act would inhibit vigorous enforcement of the customs laws, see *supra*, at 859, when there already existed a common-law remedy against customs officials for negligence in the handling of goods, see *supra*, at 860–861.  *Post*, at 866.  But, as explained above, the apparent requirement that the owner, to recover under the common law, prove negligence on the part of a specific customs official, see *supra*, at 860–861, and n. 23, combined with the obligation of the United States to indemnify the official if he acted under proper authority, see *supra*, at 860, would have minimized the effect of the extant remedies on the willingness of the Service to adopt vigorous enforcement policies and the willingness of its officials

## III

Petitioner and some commentators argue that §2680(c) should not be construed in a fashion that denies an effectual remedy to many persons whose property is damaged through the tortious conduct of customs officials.[25]   That contention has force, but it is properly addressed to Congress, not to this Court.   The language of the statute as it was written leaves us no choice but to affirm the judgment of the Court of Appeals that the Tort Claims Act does not cover suits alleging that customs officials injured property that had been detained by the Customs Service.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

The Government's construction of 28 U. S. C. §2680(c) is not the one that "first springs" to my mind.   *Ante*, at 854. Rather, I read the exception for claims arising "in respect of . . . the detention of any goods" as expressing Congress' intent to preclude liability attributable to the temporary interference with the owner's possession of his goods, as opposed to liability for physical damage to his goods.   That seems to me to be the normal reading of the statutory language that Congress employed, and the one that most Members of Congress voting on the proposal would have given it.   Moreover, my reading, unlike the Court's,[1] is supported by an examina-

---

to implement those policies.   Congress might well have feared that the creation of a remedy under the Tort Claims Act would have increased the liability of the United States to such a degree as to curtail the exercise by the Service of its authority to detain goods.

[25] Comment, Governmental Liability for Customs Officials' Negligence: *Kosak* v. *United States*, 67 Minn. L. Rev. 1040 (1983); Note, Using the Federal Tort Claims Act to Remedy Property Damage Following Customs Service Seizures, 17 U. Mich. J. of L. Ref. 83 (1983).

[1] The majority maintains that " 'any claim arising in respect of' the detention of goods means any claim 'arising out of' the detention of goods, and includes a claim resulting from negligent handling or storage of detained property."   *Ante*, at 854.

tion of the language used in other exceptions. Congress did not use the words "arising out of" in § 2680(c) but did use those words in three other subsections of the same section of the Act. See §§ 2680(b), (e), and (h). Absent persuasive evidence to the contrary, we should assume that when Congress uses different language in a series of similar provisions, it intends to express a different intention.

The language of the statute itself is thus clear enough to persuade me that Congress did not intend to exempt this property damage claim from the broad coverage of the Act. I would, of course, agree that if there were legislative history plainly identifying a contrary congressional intent, that history should be given effect. I do not believe, however, that it is proper for the Court to attach any weight at all to the kind of "clues" to legislative intent that it discusses, or to its concept of the "general purposes" that motivated various exceptions to the statute. Because the Court has done so, however, I shall respond to both parts of its rather creative approach to statutory construction.

I

In the entire 15-year history preceding the enactment of the Tort Claims Act in 1946, the Court finds only two "clues" that it believes shed any light on the meaning of § 2680(c). The first—the so-called "Holtzoff Report"—is nothing but an internal Justice Department working paper prepared in 1931 and never even mentioned in the legislative history of the 1946 Act. There is no indication that any Congressman ever heard of the document or knew that it even existed. The position of the majority—that it is "significant" that the "apparent draftsman" of the relevant language himself "believed that it would bar a suit of the sort brought by petitioner," *ante*, at 856–857—is manifestly ill-advised. The intent of a lobbyist—no matter how public spirited he may have been—should not be attributed to the Congress without positive evidence that elected legislators were aware of and shared the lobbyist's intent.

Unless we know more about the collective legislative purpose than can be gleaned from an internal document prepared by a person who was seeking legislative action, we should be guided by the sensible statement that "in construing a statute . . . the worst person to construe it is the person who is responsible for its drafting. He is very much disposed to confuse what he intended to do with the effect of the language which in fact has been employed." *Hilder* v. *Dexter*, [1902] A. C. 474, 477 (Halsbury, L. C., abstaining).[2] If the draftsman of the language in question intended it to cover such cases as this one, he failed.

The second "clue" relied upon by the majority consists of a brief summary in the House Committee Report which casu-

---

[2] The majority's analysis, it should be observed, puts the cart before the horse.

"The essence of bill drafting is placing a legislative proposal in the proper legal phraseology and form to achieve congressional intent. It is primarily a task of legal analysis and research rather than of composition. . . . Framing the legal language to embody congressional purpose is not as difficult as ascertaining what that purpose is in its entirety. While a committee (or individual member of Congress, as the case may be) is in the process of working out what it wants to do, the legislative counsel assist it by explaining the effect of alternative proposals. Even after the committee (or Congressman) has settled upon the major outlines of a measure, subsidiary policy questions seem to unfold endlessly. The legislative counsel must point up all of those for the committee (or Congressman) to decide. To accomplish that, the legislative counsel must envisage the broad application of the proposed law in all of its ramifications." K. Kofmehl, Professional Staffs of Congress 189 (3d ed. 1977) (footnote omitted).

Many bills are of course initially drafted in the Executive Branch. After today's decision, we can anticipate executive agencies searching long dormant files for documents similar to the Holtzoff Report. We can also anticipate that private parties will attempt to capitalize on this new reservoir of "legislative" history as well, through discovery and perhaps the Freedom of Information Act. In light of the Government's reliance on the Holtzoff Report, presumably it will not assert that this kind of material is privileged when private parties are in search of "legislative" intent.

Finally, the language in some bills is initially drafted by private lobbyists. One doubts that the majority would find "significant" the intention of such a draftsman when that intention was not shared with the Congress.

ally uses the prepositional phrase "arising out of" to introduce a truncated list of the exceptions. *Ante*, at 857. But the "casual" use of the latter phrase in the Committee Report is as understandable as it is insignificant. It is nothing more than an introduction. In such an introduction, precision of meaning is naturally and knowingly sacrificed in the interest of brevity.

## II

The Court's reliance on the "general purposes" for creating exceptions does nothing more than explain why Congress might reasonably have decided to create this exception.[3] Those purposes are no more persuasive than the general purposes motivating the enactment of the broad waiver of sovereign immunity effected by the statute itself.

The hypothetical rationales attributed to Congress by the majority are also internally inconsistent. If Congress, as a matter of public policy, determined that these claims should not be entertained because of the possibility for fraud, the majority's suggestion that petitioner may have a remedy

---

[3] Some of the majority's *ipse dixit* about the Customs Service does merit response. We are told, for example, without citation to any authority, much less any statements in the legislative history, that the Customs Service does not have the staff or resources to inspect the goods it detains. *Ante*, at 859. Notwithstanding the fact that it appears the Service undertakes such inspections now to some extent, see U. S. Customs Service, Customs Inspector Handbook, §§ 3.55(b), 5.72 (1982); see generally 19 CFR §§ 158.21–158.30 (1983), one wonders what the staff which detain the items are doing with them if not inspecting them, why they cannot make a record of the condition of the goods, why this burden would be onerous, and why the Congress would want Government officials charged with custody of a citizen's property to be free from this burden that any reasonably prudent person under the circumstances would undertake. The answer, or so it would seem, is that the "Government, as a defendant, can exert an unctuous persuasiveness because it can clothe official carelessness with a public interest. Hence, one of the unanticipated consequences of the Tort Claims Act has been to throw the weight of government influence on the side of lax standards of care in the negligence cases which it defends." *Dalehite* v. *United States*, 346 U. S. 15, 50 (1953) (Jackson, J., dissenting).

under the Tucker Act is quite inexplicable.[4]    Similarly, if Congress "may well have wished not to dampen the enforcement efforts of the Service by exposing the *Government* to private damages suits by disgruntled owners of detained property," *ante,* at 859 (emphasis added), its failure to abrogate the common-law remedy against the individual customs officer is inexplicable.   For I would assume that customs officers' enforcement efforts would be dampened far more by a threat of personal liability than by a threat of governmental liability.   Reliance on an assumed reluctance to waive immunity regarding claims for which "adequate" remedies were already available simply begs the question.   A basic reason for the Tort Claims Act was, of course, the inadequacy of the existing remedies, and there is no indication in the legislative history that Congress considered the previous remedies in this specific area adequate.

A discussion of the general reasons for drafting exceptions to the Act is no more enlightening regarding the specific exception at issue here than a consideration of the principal purpose that Congress sought to achieve by enacting this important reform legislation.

Tort claims bills had floundered on legislative shoals for nearly two decades.[5]   A general waiver of sovereign immu-

---

[4] Cf. *Feres* v. *United States,* 340 U. S. 135, 139 (1950) ("This Act, however, should be construed to fit, so far as will comport with its words, into the entire statutory system of remedies against the Government to make a workable, consistent and equitable whole.   The Tort Claims Act was not an isolated and spontaneous flash of congressional generosity.   It marks the culmination of a long effort to mitigate unjust consequences of sovereign immunity from suit").

[5] The majority largely relies on the legislative history of bills which were never enacted into law.   All legislation has it germinal period, but the intentions of the proponents of previous legislation which was never enacted are at most a secondary aid to construing the intent of those that enacted a descendant of it.   The earlier legislation may have failed to be enacted for a variety of reasons, of course, but one reason for failure is that the reasons

nity for torts was finally propelled into law by the legislative reform movement which culminated in the Legislative Reorganization Act of 1946. *E. g., United States* v. *Yellow Cab Co.,* 340 U. S. 543, 549–550 (1951). The "overwhelming purpose" of the Congress which enacted the Tort Claims Act was to remove the burden of dealing with tort claims from Congress which had adjudicated these claims in the form of passing private bills, and the "reports at that session omitted previous discussions which tended to restrict the scope of the Tort Claims bill." *Ibid.* Hence, the Joint Committee on the Organization of Congress recommended that "Congress delegate authority to the Federal Courts and to the Court of Claims to hear and settle claims against the Federal Government," explaining its recommendation, and the shortcomings of resolving such claims through consideration of private bills, as follows:

> "Congress is poorly equipped to serve as a judicial tribunal for the settlement of private claims against the Government of the United States. This method of handling individual claims does not work well either for the Government or for the individual claimant, while the cost of legislating the settlement in many cases far exceeds the total amounts involved.
>
> "Long delays in consideration of claims against the Government, time consumed by the Claims Committees

offered by the proponents were unconvincing to the majority of the Congress. The same proposal may be justified on different rationales, however, and it is the rationale of the Congress which enacts a measure which defines congressional purpose and intent. In the context of the Federal Tort Claims Act, we have recognized the extremely limited utility, and sometimes misleading nature, of reliance upon the legislative history of the plethora of earlier tort claims bills which failed to command a consensus, acknowledging that the measure ultimately enacted was presented to the Congress in a "new aspect" when it become Part IV of the proposed Legislative Reorganization Act. *United States* v. *Yellow Cab Co.,* 340 U. S. 543, 550–552, and n. 8 (1951).

of the House and Senate, and crowded private calendars combine to make this an inefficient method of procedure.

"The United States courts are well able and equipped to hear these claims and to decide them with justice and equity both to the Government and to the claimants. . . ." Report of the Joint Committee on the Organization of Congress pursuant to H. Con. Res. 18, S. Rep. No. 1011, 79th Cong., 2d Sess., 25 (1946), H. R. Rep. No. 1675, 79th Cong., 2d Sess., 25 (1946).[6]

If our construction of the narrow provision before us is to be determined by reference to broad purposes, in the context of the 1946 Act the exceptions are best rationalized by reference to Congress' central purpose. Absent specific legislative history pertaining to the sort of claims involved in this case, the general bases for exceptions relied upon by the majority are surely less persuasive than the overwhelming purpose of the statute. Courts of law have been up to the task of discovering fraud for centuries; it is completely unrealistic

---

[6] See, e. g., S. Rep. No. 1400, 79th Cong., 2d Sess., 29–31 (1946); see also *Dalehite* v. *United States*, 346 U. S., at 24–25; *United States* v. *Yellow Cab Co.*, 340 U. S., at 548–550 (The Federal Tort Claims Act "merely substitutes the District Courts for Congress as the agency to determine the validity and amount of [tort] claims." *Id.*, at 549); *Feres* v. *United States*, *supra*, at 140.

The Tort Claims Act was one part of the Legislative Reorganization Act of 1946. The Legislative Reorganization Act was the product of a year of work by the Joint Committee on the Organization of Congress. *E. g.*, S. Rep. No. 1400, *supra*, at 1. The Joint Committee, however, was not empowered to report legislation. See H. Con. Res. 18, 79th Cong., 1st Sess. (1945). The bill embodying its work, S. 2177, 79th Cong., 2d Sess., sponsored by Senator La Follette (the Chairman of the Joint Committee) was referred to a Special Committee on the Organization of the Congress in the Senate, chaired by Senator La Follette, created for the purpose of reporting the bill. See S. Res. 260, 79th Cong., 2d Sess. (1946). In the House, the Committee on Rules simply reported a rule permitting floor consideration of S. 2177, as passed in the Senate, and a substitute proposed by Representative Monroney (the Vice Chairman of the Joint Committee). See H. Res. 717, 79th Cong., 2d Sess. (1946).

to suggest that Congress did not think the judiciary up to this task, or that it wanted to reserve such cases for its own adjudication because it is better equipped to weed out fraudulent claims.

In the final analysis, one must conclude that the legislative history provides only the most general guidance on resolving the issue in this case. For any basic policy argument in favor of making an exception will support a broad construction of the provision in question, just as any basic policy argument in favor of the Act's waiver of sovereign immunity will support a narrow construction of this or any other exception. The Government's policy arguments respecting the administrative burden on the Customs Service and the potential for fraudulent claims, like petitioner's policy arguments, are "properly addressed to Congress, not to this Court." *Ante*, at 862.

### III

Therefore, this is "a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute." *Greenwood* v. *United States*, 350 U. S. 366, 374 (1956). I would acknowledge—indeed I do acknowledge—that the Court's reading of the statutory language is entirely plausible. I would, however, tilt the scales in favor of recovery by attaching some weight to the particular language used in § 2680(c). And I must disagree with the Court's reliance on the general purposes underlying exceptions when no consideration is given to the general purpose of the statute itself. But most importantly, I would eschew any reliance on the intent of the lobbyist whose opinion on the question before us was not on the public record.

I therefore respectfully dissent.