Linette Marie **CASSAGNOL–FIGUEROA** et al., Plaintiffs,

v.

**UNITED STATES of America,** **Defendant.**

Civ. No. 89–1693(JP).

United States District Court, D. Puerto Rico.

Jan. 29, 1991.

James A. Toro, Nachman & Fernández Seín, Santurce, P.R., for plaintiffs.

Lydia Pelegrín, Asst. U.S. Atty., Hato Rey, P.R., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

The Court has before it defendant United States of America's Motion for Summary Judgment. On February 27, 1988, plaintiff Linette Marie Cassagnol–Figueroa fell over a low wall at El Morro, from the sixth level to the fifth level near the base of what is called the Austria Bastion ramp. The plaintiffs, Linette Marie Cassagnol–Figueroa, and co-plaintiffs Robert Cassagnol–Chenet and Juana Figueroa–Acevedo de Cassagnol, her parents, allege that the fall was caused by defendant United States of America and its Department of the Interior. Ms. Cassagnol–Figueroa claims that due to the injuries which resulted from the fall, she has been unable to perform her duties as a tour guide. She seeks $753,-000.00 for the cost of her medical expenses and loss of income. Co-plaintiffs Roberto Cassagnol–Chenet and Juana Figueroa–Acevedo de Cassagnol each seek $100,-000.00 for damages due to the anxiety and mental anguish of caring for and witnessing their daughter's pain. Federal jurisdiction is invoked pursuant to Federal Tort Claims Act, 28 U.S.C. §§ 1346, *et seq.*

Defendant United States of America and its Department of the Interior, contend that plaintiff Cassagnol–Figueroa contributed in whole or in part to her alleged injuries. The defendant further contends that this case falls under the discretionary function exception of the Federal Torts Claims Act. For the reasons stated below, we grant the defendant's motion for summary judgment.

## I. THE FACTS

On February 27, 1988, the plaintiff Linette Marie Cassagnol–Figueroa was employed as a tour guide by a French tour group. Although it is the general policy of the National Park Service (NPS) to only allow its employees to give tours of its

historic sites, an exception is made for tour groups which speak neither English nor Spanish. El Morro is a San Juan National Historic Site administered by the National Park Service, Department of the Interior. On the day she fell, the plaintiff was giving a morning tour of El Morro to a French speaking group, as she had been permitted to do a number of times before. The plaintiff was wearing high heels and carried a sign, as a strong wind blew. The Superintendent of the San Juan National Historic Site for the NPS, speculates that the plaintiff had her back to the Austria Bastion [1] wall as she gave the tour. Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Exhibit I, Memorandum from W.P. Crawford, San Juan National Historic Site Superintendent. There are two warning signs posted in the entrance of El Morro which advise visitors against "climbing on walls, [and] running on ramps". The same warning is published in the free park folder for visitors.

The plaintiff fell approximately 30 feet from the upper level of the fort, over a wall which is at least 12 inches in height. As a result of her fall, the plaintiff suffered, amongst other injuries, the following multiple fractures: in her right and left upper pubic rami with overriding of fragments on the left ramus; an evulsion fracture of right side of pubic symphysis; fracture of the left sacro-iliac joint; a left subcondylar mandibular fracture with closed reduction and intermaxillary fixation; fracture of the distal portion of the nasal bone; fractures of the third, fourth, and fifth matatarsals of the left foot; fracture with lateral displacement of the second metatarsal of the right foot.

## II. SUMMARY JUDGMENT—STANDARD OF REVIEW

■ A motion for summary judgment is appropriate when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir.1989); *see e.g., Medina–Muñoz v. R.J. Reynolds*, 896 F.2d 5 (1st Cir.1990). A "genuine" issue is one that is dispositive, and must therefore be decided at trial. *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A "material" fact is one which affects the outcome of the suit and must be resolved before attending to related legal issues. *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d at 181.

■ Essentially, Rule 56(e) mandates that summary judgment be entered against a party who fails to establish the existence of an element essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Thus, the burden is first on the movant, to show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. at 325, 106 S.Ct. at 2554. Thereafter, the burden shifts to the nonmovant to establish the existence of a genuine material issue. *Brennan v. Hendrigan*, 888 F.2d at 191. The nonmovant, however, cannot rest upon mere allegation or denial of the pleadings. Fed.R.Civ.P. 56.

In the instant case, the uncontroverted material facts demonstrate, that the defendant is exempt from liability under the Federal Torts Claim Act 28 U.S.C. § 1346(b) discretionary function exemption. Therefore, as a matter of law, the plaintiff's tort claim must be dismissed.

## III. THE FEDERAL TORT CLAIMS ACT

Defendant contends that summary judgment should be entered in its favor because it is exempt from liability under the Federal Torts Claim Act 28 U.S.C. § 1346(b) dis-

---

**1.** The Austria Bastion is a half-bastion. A half-bastion is a five-sided projection joined by its gorge (entrance) to the body of a fortification. It has one flank from which defensive fire can scour adjacent curtains, and one face.

cretionary function exemption 28 U.S.C. § 2680(a).

The Federal Torts Claim Act (FTCA) is a broad waiver of sovereign immunity. FTCA grants district courts jurisdiction to hear tort suits against the United States for damages caused by its employees acting in the scope of their duties. If a private person would be liable under the law of the state where the tort occurred, then the plaintiff may sue the United States as if it were a private person. 28 U.S.C. §§ 2674; 1346(b).

Among the fourteen statutory exceptions to this waiver of immunity is 28 U.S.C. § 2680(a), which exempts:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The Court's investigation into the legislative history of § 2680 in *Kosak v. United States*, 465 U.S. 848, 858, 104 S.Ct. 1519, 1525, 79 L.Ed.2d 860 (1984), reveals that there are three objectives underlying the FTCA exemptions:

> ensuring that "certain governmental activities" not be disrupted by the threat of damage suits; avoiding exposure of the United States to liability for excessive or fraudulent claims; and not extending the coverage of the Act to suits for which adequate remedies were already available.

Because § 2680(a) is a limitation on the waiver of sovereign immunity, cases which fall within the discretionary function exception must be dismissed for lack of subject matter jurisdiction. *See* 28 U.S.C. § 1346(b); *Irving v. United States*, 909 F.2d 598, 600 (1990). Rules for the application of the discretionary function exemption were developed in the unanimous Supreme Court cases of *U.S. v. Varig*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660

(1984) and *Berkovitz v. U.S.*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

## A. DISCRETIONARY FUNCTION EXEMPTION TEST

At issue in *Berkovitz v. U.S.*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), was a government agency's failure to determine that certain required tests for purity and safety of a polio vaccine had been satisfied before its release for public use. In its analysis of the government agency's actions, the Court formulated a two part test for the application of the discretionary function exemption. "The discretionary function exemption applies only to conduct that involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 539, 108 S.Ct. at 1960. First the trier of fact must determine whether a permissible judgment was involved. The fact finder must then ascertain whether that judgment was based on policy considerations.

Under the first part of the test, the government must show that the government agency officials in question possessed the discretion to determine safety measures where they were employed. "Conduct cannot be discretionary unless it involves, an element of judgment or choice." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958. In *Berkovitz*, the Court remanded the case to the Court of Appeals for further proceedings, in order to determine whether the challenged conduct did not involve the permissible exercise of policy discretion. The Court further observed that the FTCA exception did not preclude any and all acts arising out of the regulatory programs of federal agencies. If a government agency's "policy leaves no room for an official to exercise policy judgment in performing a given act, or if the act simply does not involve the exercise of such judgment, the discretionary function exception does not bar a claim that the act was negligent or wrongful". *Berkovitz*, 486 U.S. at 546, 108 S.Ct. at 1964. In other words, "where there is room for policy judgment and decision there is discretion." *Dalehite v. U.S.*, 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953), *reh'g de-*

*nied,* 347 U.S. 924, 74 S.Ct. 511, 98 L.Ed. 1078 (1954).

In *U.S. v. S.A. Empresa De Viacao Aerea Rio Grandense,* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) the Court set forth the important principle that the nature of conduct challenged rather than the status of the actor, actually governs whether the discretionary function exception applies. The question presented in *Varig* was whether the United States could be held liable under the FTCA for the negligence of the Federal Aviation Administration (FAA) in certifying certain aircraft for use in commercial aviation. The Court held that the discretionary function exception immunized the United States and precluded a tort action based upon the conduct of the FAA in its aircraft certification process. The Court also held that the FAA's implementation of a spot-check mechanism to review compliance by private individuals with federal safety regulations was a discretionary activity.

The *Varig* principle was further amplified by the First Circuit in *Irving v. U.S.,* 909 F.2d 598, 602 (1st Cir.1990), which stated that the "proper inquiry must center on the amount of discretion actually held and exercised by the government employee whose actions or omissions are at issue." In *Irving,* the plaintiff alleged that she was injured at work because Occupational Safety and Health Administration (OSHA) inspectors, on two separate occasions, negligently failed to notice a dangerous condition which was a serious violation of OSHA standards. The case was remanded to the district court for resolution of whether OSHA policy left the thoroughness of inspections a matter of choice for its compliance officers. An earlier First Circuit case goes as far to say that "[i]f a discretionary function was involved, the fact that critical factors were not considered or that the decision was negligently made will not bring the challenged conduct outside of the exception." *Dube v. Pittsburgh Corning,* 870 F.2d 790, 797 (1st Cir.1989).

■ Under the second part of the test, the government must show that its official made a *policy* decision when exercising her discretion. In order to evaluate whether an official's judgment is a policy decision, the trier of fact must consider the objectives behind the existence of the institution for which the official works. For instance, in *Ayer v. U.S.,* 902 F.2d 1038 (1st Cir. 1990), the Court determined that the objective of the defendant U.S. Air Force missile launch facility was "operational realism." The purpose of the facility was to retain combat effectiveness. Consequently, the officials in charge thought it necessary to preserve the features of the original design which maintained the system's ability to withstand nuclear attack. Therefore, the decision not to install safety railings or to make other safety changes in the launch control capsule where the plaintiff was injured fell within the discretionary function exemption.

## IV. APPLICATION OF THE TEST

In order to evaluate the defendant's Motion for Summary Judgment, the discretionary function exemption test as developed by *Berkovitz* and First Circuit case law, must be applied to the instant case.

## A. THE SUPERVISOR'S DISCRETION

■ Under the first part of the test, we must first determine whether a permissible judgment was involved. When El Morro was inspected in 1980 by Ranger Gregorio Batista, Safety Committee Chairperson of the National Park Service, Santiago Cruz, was the Superintendent of the San Juan National Historic Site. *See* Defendant's Motion for Summary Judgment, Exhibit 4, Affidavit of S. Cruz. It was within Cruz's discretion to follow or disregard the Safety Committee's recommendation to construct a pipe and cyclone fence railing surrounding Austria Bastion, an identified hazard. *Id.* Also, Cruz acted within his discretion when deciding not to follow the Safety Committee recommendation for the seven reasons articulated in his affidavit. The seven reasons were as follows: 1) El Morro is a 450 year old fort that has been important militarily in the sixteenth, seventeenth, eighteenth, nineteenth and twentieth centuries; 2) Since 1949 when it opened

to the public, it has been preserved in its original form for all visitors to enjoy; 3) I decided against putting guardrails, pipes, or cyclone fences because it would ruin the fort aesthetically and diminish its historical significance which has been carefully and consistently preserved for 450 years. To cover the openings with pipes or cyclone fences would be to diminish and destroy the original design; 4) Also, the fort had warning signs on its grounds and on a folder which was distributed to visitors; 5) Park rangers were stationed throughout to aid visitors; 6) Park rangers are trained to give all the guided tours. Authorized outside tours guides are given an orientation so that they are familiar with the fort; 7) I also opposed having chains, pipes, or cyclone fences because if we were to change the configuration in order to accommodate careless visitors or guides, the fort's historical value would have been destroyed. This was unnecessary and would have clearly compromised the historic nature of the fort. *See id.* The National Park Service clearly left safety construction to the complete discretion of the Superintendent of the Historic Site.

In its opposition, plaintiff fails to present any facts which contest the proposition that NPS left safety construction to the complete discretion of the Superintendent. Plaintiff's submission of a report by A.C. Macris, an alleged safety expert, cannot be considered by the Court, as the plaintiff failed to include the required qualifying affidavit. Even if the Court could have taken the report into consideration, the report would not have dispensed with the Superintendent's discretion under these circumstances. Consequently, plaintiff did not properly bear its burden of demonstrating specific facts showing a genuine issue for trial. *See* Fed.R.Civ.P. 56(e), and *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990). Plaintiff has only offered unsupported, and conclusory statements opposing defendant's assertions. A party opposing a motion for summary judgment may not rest upon mere allegations, it must set forth specific facts demonstrating that there is a genuine issue for trial. *Herbert v. Mohawk Rubber Co.*, 872 F.2d 1104,

1106 (1st Cir.1989); *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). Thus, this case satisfies the first prong of the test, because the conduct involved an element of judgment. *See, Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1958.

## B. HISTORICAL IMPORTANCE OF EL MORRO

The second part of the test requires a showing that the exercise of discretion was policy based. Superintendent Cruz's affidavit unequivocally reveals that his decision not to install safety features for the Austria Bastion was based on preserving the historical significance of the original design. This rationale satisfies the second prong of the test. The plaintiff mistakenly asserts that the exemption is restricted only to economic, social, or political policy decisions. (Plaintiff's Supplemental Brief in Opposition to Defendant's Motion for Summary Judgment at 5). As the First Circuit recognized in *Ayer v. U.S., supra* at 1043, with regard to the U.S. Air Force, policy decisions whose goals are based on furthering the aims of an institution are just as important as policy decisions based upon economic, social, or political purposes. In addition, the First Circuit has determined that *Berkovitz* "requires that a court look at the *range of choice* the agency delegates to the employee who performs the task in question." *Irving*, 909 F.2d at 603 (emphasis ours). One of El Morro's Supervisor's choices concerns the historical importance of El Morro. As a San Juan National Historic Site El Morro is managed by the National Park Service (NPS), Department of the Interior. The objective of the NPS is set forth at 16 U.S.C. § 1, states, in relevant part:

The service thus established shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations ... by such means and said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the

**520**

same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

El Morro is the oldest and most strategic of the castles that formed San Juan's defensive system. It represents the best military thought of the time for defense against attack both by land and by sea. El Morro formed the nucleus of the San Juan fortifications. The Spanish fortifications reached from the Boquerón Inlet to El Cañuelo. In the days when sailing vessels followed southerly trade winds from Europe to the West Indies, the port was a safe haven from tropical storms. But more importantly, it provided a secure naval base from which to control the shipping into the Caribbean and the shores of Mexico and South America. The English and later the French and the Dutch, wanted the port for this very purpose. El Morro's growth since the sixteenth century results from the intense attacks by foreign powers such as England, Holland and France. *See* 9 E.E. Pérez–Chanis, *La Gran Enciclopedia de Puerto Rico* 19 (V. Báez 2ed.1981) (translation ours).

1) The Architecture

Construction of El Morro began in 1539 and continued up until 1787. In the sixteenth century, El Morro was a fortified tower which guarded the entrance to the bay of Old San Juan. In fortifying Old San Juan, the military engineers Juan Bautista Antonelli, Tomás O'Daly and Alejandro O'Reilly, made maximum use of the natural defensive features of the old city. Old San Juan is situated on the western end of a small barrier island which lies between the broad San Juan Bay and the open sea. A steep headland overlooks the only navigable entrance to the harbor. The rest of the island's rocky seacoast is skirted by a treacherous reef of the Atlantic ocean. At the eastern end of San Juan is Boquerón Inlet, a passage too rocky and shallow for large vessels of war and thus a natural water barrier against flanking attacks of the island.

Because eighteenth century warfare was vicious, El Morro's architecture was made to reflect the engineering competence and craftsmanship that went into a preeminent fortification.

> An eighteenth century man-of-war was a thick-hulled, towering vessel; virtually a floating fortress mounted with cannon in two or more tiers. On the fighting deck were marines ready to board the enemy, repel boarders or take a beachhead. Musketeers who perched in the rigging or crowsnests supported the marines and harassed the enemy with their fire. Against these formidable ships, El Morro could bring to bear batteries of cannon on four different levels.

A. Manucy & R. Torres–Reyes, *Puerto Rico and the Forts of Old San Juan* 8 (1973) [hereinafter *The Forts* ].

At sea level beside the entrance channel was the water battery which could break the waterline planking of passing vessels. The guns of the second level faced directly seaward toward incoming traffic and had the advantage of range and visibility over ships' cannons. Most of the guns or gunners were in bomb-proof casemates or gunroom for protection from exploding projectiles.

The main battery on the third level, the Sánta Bárbara, was the largest of all the harbor defenses. "Like a great prow jutting seaward, the gun tier of Sánta Bárbara still gives El Morro the look of a giant battleship." *The Forts* at 8. *See also* M. de Los Angeles, *Arquitectura en San Juan de Puerto Rico* (1980). The fourth level guns supported the Sánta Bárbara Battery. The field of vision of the fourth level guns, included the entire western and part of the eastern sector of San Juan. Because all four levels were vulnerable from the rear, a fifth tier of guns pointed landward, mounted on a barrier wall called the "hornwork". This work closed El Morro on the land side. In front of it was a barrier moat, and beyond that was cleared land called glacis. The glacis was smoothed and sloped so that there would be no shelter from gunners and musketeers who lined the fort walls. Hidden beneath the smooth slope were underground passages known as mining galleries in which

explosives could be placed to blow up siege operations if enemies approached the landward side of the fort.

### 2) The Battles

In the sixteenth century, there was an English interest in the profits to be had from raids on Spanish towns and shipping in the New World. At that time Sir Francis Drake was a "human symbol of England's emerging seapower". *The Forts* at 35. Because of the threat of Sir Francis Drake, King Phillip II of Spain approved three projects to strengthen the fortification of Old San Juan in 1589. The three projects were: 1) a fort at El Morro; 2) a sea-to-sea wall from La Fortaleza to the Atlantic shore; and 3) the sinking of a hulk to block the channel at El Boquerón Inlet. Under the new construction project, a half-bastion overlooking the bay and commanding both the harbor and the land approach was erected. It was named the Austria Bastion [2] and became the dominant position. With the construction of El Morro, visiting Captain Pedro de Salazar wrote to the Spanish crown, "there is no longer town talk of running to the hills when corsairs come. In fact, because corsairs sightings have increased, Puerto Ricans from the hills crowd the streets of San Juan, seeking protection in the new citadel. When I first came here I couldn't find a man in town." *The Forts* at 41. Thus, since its creation, El Morro has been significant in the lives of Puerto Rico's inhabitants.

In 1595 Queen Elizabeth gave Drake and his cousin, John Hawkins the slave trader and merchant, joint command of making Puerto Rico a permanent English base. Coastal lookouts at El Morro saw the English sails on November 22, 1595. Spanish cannons were fired 28 times, and the English drew back to their fleet. Again in 1598, Queen Elizabeth decided that Puerto Rico must become an English military station. On June 17, 1598, Sir George Clifford, Earl of Cumberland unexpectedly

struck to the southeast from El Morro, at San Antonio Bridge.[3] After two hours of violent combat, the Spaniards fled to El Morro. Cumberland's fire battered the hornwork, and forced the defenders from their parapets and to dismount their guns. On July 1, 1598, the Spaniards surrendered and the English moved into El Morro. Due to a severe bout of dysentery, the English ended their occupation and returned to England on August 27, 1598.

Thereafter, Spain's mission became to strengthen and expand defenses in Puerto Rico. The work on El Morro started in 1599. Between 1601 and 1609, a major reconstruction took place. The hornwork was rebuilt with much stronger foundations than before, to support the high and massive walls. "Thus, after its capture by Cumberland, San Juan grew even stronger, with expanded defenses to the east and west, and at El Morro a hornwork rebuilt in the massive construction that still stands today." *The Forts*, at 51.

In 1625, the Dutch attacked the island. Because of a lack of adequate supplies, Puerto Rico's Governor marched the entire garrison into El Morro. The massive hornwork was heavily damaged by Dutch cannon fire. When the Governor refused to surrender, the Dutch proceeded to burn 96 buildings, before leaving the island. After the 1625 attack the damage to the fort was repaired. To protect the newly rebuilt San Juan, the Spanish planned a new wall to surround all of the city, except for where natural battlements already existed on the Atlantic side.

The city wall had three gates. The gate of San Juan was next to La Fortaleza, near the anchorage. San Justo, the second gate opened on the southern area. The gate of Santiago, located on the east just below the San Cristóbal fort was the only entrance to the city by land. The new wall construction strengthened the southern side, redesigned the southwest, and created a north-

---

**2.** Beneath the massive eighteenth century walls of the Austria Bastion, are the remains of the 1589 hornwork. *The Forts* at 39.

**3.** The original San Antonio bridge has since been remodeled and renamed "El Puente Los Hermanos".

ern wall, so that San Juan was completely enclosed.

During the English–French conflicts from 1793–1815, Spain was a French ally, and thus Puerto Rico was once again subject to attack. On April 17, 1791, Sir Ralph Abercromby attacked the island but was forced to withdraw by May 1, 1791. Abercromby wrote the English crown that the San Juan defenses were "both by Nature and Art, very strong, and could have withstood ten times more firepower", than he had. *The Fort* at 76. *See also* J.M. Zapatero, *La Guerra del Caribe en Siglo XVIII* (1964).

By 1830, the Spanish–American empire had collapsed and San Juan was no longer important as a gateway bastion. In addition, foreign enemies had by this time achieved their goal of open ports and free trade. Thus, they no longer coveted the island as a base of military operations. It was not until the United States declared war upon Spain in support of the Cuban struggle for independence in 1898, that Puerto Rico was once again subject to enemy fire. On May 12, 1898 San Juan was attacked by the U.S. fleet. However, negotiations with Spain brought a cease fire on August 13, 1898. The prizes of peace were Cuban sovereignty and the cession of Puerto Rico to the United States. Spain lost the remnants of the Spanish–American empire.

Thus, El Morro is not only historically important in and of itself, but it is also an integral part of what makes the city Old San Juan so historically important. Old San Juan was founded in 1521, and its charm today relates to its history as a fortified city. The preservation of Old San Juan's historic heritage maintains the "historic bonds between the Americas." U.S. Department of the Interior, San Juan: National Historic Site (information brochure). Some of these historic bonds include, the symbol of Spain's ancient power, and Puerto Rico's new chapter in history, which commenced in 1898 when Spain's four-century rule came to an end and the defenses of San Juan were peacefully surrendered to the United States. Given the historical importance of Old San Juan as a fortified city, any alterations in the San Juan's ancient forts, would lessen the city's historical value. Thus, Supervisor Cruz's decision based on preserving the historical significance of El Morro, was clearly an exercise of discretion grounded in sound policy judgment.

Any changes in the architecture of El Morro would eventually transform it into a "Disney World" entertainment site, and its historical value would be lost to future generations. The students of history would no longer be able to recreate the past with any degree of accuracy. The epoch of extreme nationalism together with religious fervor incarnated the times when El Morro was built. The Spaniards were conquering the New World with the sword and the cross. The names of those persons in history that traced the wedge whether through the sacraments or the cannons, is written in blood and religious symbols throughout the Americas. Their descendants carry with pride their ancestry— among them are the following families: the Alarcon family descended from Alaric the last Visigoth King of Spain [4]; the Benítez, from Vieques, Puerto Rico; the Rexach, from San Juan, Puerto Rico; the Castañer, from Yauco, Puerto Rico; the Larrea, Fanjul and Pesant families, from Cuba; the Peón and the Molina families from the Province of Yucatán, México; the Valenzuelas and Obregón families, from Columbia. That was the beginning, thereafter the world emptied itself into the Americas. The United States, once constituted as a nation, became a nation of nations. Families came from all over the world: the Axelrod, from Russia; Danyliw, from the Ukraine; Fulner, from Germany; the Russo, Ancellotti and Antinozzi families, from Italy; Biron, from France; the Tylor, Byron, Billerbeck, and St. Onge families from England; the Cullina, Toole, Daly, Calnen, Garrity, Hallisey, and Nelson families from Ireland; the Limaneck and Spitzig families, from Poland; and families from all the other countries of the world. All of these individuals are ontological fragments, a moment in time and an atomos in space.

---

**4.** Alaric was defeated by the Moors near Cadiz, in the eighth century.

Philosophically, these individuals and the nations involved in the Epic of Discovery and Conquest of America, were part of the stride towards a collective mindset. An example of the present day collective mindset is the world united to preserve civilization in the Persian Gulf, under the foresighted leadership of the United States of America. Let the future come—if historical sites are conserved extant, the "Planetary Man" [5] will be better able to recognize and study our era of extreme nationalism. Let it be now, so that in the year 1992 the World can truly celebrate the Discovery of America. One of the planned festivities is appropriately, a regatta of a hundred sailing vessels that will leave the Port of Cadiz, Spain and make their first stop in the Americas by passing El Morro as they enter the Bay of San Juan in Puerto Rico, clearly reinforcing the historical importance of El Morro.

## V. CONCLUSION

In conclusion, a review of the record and case law reveals that this case falls under the discretionary function exception to the Federal Torts Claims Act. The plaintiffs have failed to establish a genuine material issue.

Wherefore, in view of the foregoing, defendant United States of America's Motion for Summary Judgment is GRANTED. Judgment shall be entered accordingly.

IT IS SO ORDERED.

---

**5.** W. Desan, *Let the Future Come* (1987) (A planetary man seeks global unity for a future of universal peace by bearing in mind the historical errors of individualism and nationalism).