(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES POSTAL SERVICE ET AL. *v.* KONAN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 24–351.  Argued October 8, 2025—Decided February 24, 2026

Respondent Lebene Konan and the local post office in Euless, Texas, had an extended dispute concerning mail delivery to two rental properties owned by Konan.  Konan alleged that, among other things, United States Postal Service employees intentionally withheld her mail and interfered with its delivery.  After administrative complaints proved unsuccessful, Konan sued the United States in federal court, bringing various state-law tort claims alleging that the United States Postal Service intentionally and wrongfully withheld her mail.  The District Court dismissed Konan's complaint pursuant to the Federal Tort Claims Act's postal exception, under which the United States retains sovereign immunity for all claims "arising out of the loss, miscarriage, or negligent transmission of letters or postal matter," 28 U. S. C. §2680(b).  The District Court concluded that the United States enjoys sovereign immunity from Konan's claims because they all relate to personal or financial harms arising from nondelivery of mail.  The District Court further held that the postal exception is not limited to merely negligent failure to properly carry the mail.  The Fifth Circuit reversed, holding that the terms "loss," "miscarriage," and "negligent transmission" do not encompass the intentional act of not delivering the mail at all.  In contrast, the First and Second Circuits have interpreted the postal exception to apply to suits even when they arise from harms caused by intentional misconduct.  The Court granted certiorari to resolve the split.

*Held*: The United States retains sovereign immunity for claims arising out of the intentional nondelivery of mail because both "miscarriage" and "loss" of mail under the FTCA's postal exception can occur as a

result of the Postal Service's intentional failure to deliver the mail. Pp. 5–13.

(a) The postal exception reflects Congress's judgment that redress for "harms" of "the sort primarily identified with the Postal Service's function of transporting mail throughout the United States" should not come from potentially burdensome tort suits. *Dolan* v. *Postal Service*, 546 U. S. 481, 489. Pp. 5–6.

(b) Both "miscarriage" and "loss" of mail under the postal exception can occur as a result of the Postal Service's intentional failure to deliver the mail. Pp. 6–11.

(1) The Court interprets statutory terms according to the ordinary meanings they had when they were enacted. *Wisconsin Central Ltd.* v. *United States*, 585 U. S. 274, 277. When Congress enacted the FTCA in 1946, the "miscarriage" of mail ordinarily included any failure of mail to properly arrive at its intended destination. Dictionaries published around that time confirm that a "miscarriage" of mail happened when mail failed to arrive at its destination. The Court declines to limit "miscarriage" to negligent failures, as no dictionaries cited impose this limitation, and ordinary speakers used "miscarriage" to refer to problems with mail caused by intentional misconduct, such as when mail was stolen or burned. The Court also declines to limit "miscarriage" to when mail goes to the wrong address, as speakers used the term when mail failed to reach its intended destination regardless of where the mail ended up, including when mail was delayed, came too late, or was left in the post office. Pp. 6–8.

(2) When Congress enacted the FTCA, the "loss" of mail ordinarily meant a deprivation of mail, regardless of how the deprivation was brought about. Contemporary dictionaries defined "loss" as the act or fact of losing or suffering deprivation, and one can suffer a deprivation of something when another intentionally keeps that thing for himself. Konan alleged that she was entitled to possession of her mail but that the Postal Service converted it, meaning she was "deprived of the use and possession of the property," Black's Law Dictionary 421, so her claims arise out of the loss of her mail. The Court disagrees with the attempt by Konan to limit "loss" to only inadvertent losses. A loss can be the result of another person's intentional misconduct, and ordinary speakers commonly described a "loss" of mail from theft, including theft by the carrier. The Court also disagrees with the argument that the postal exception applies only when the Postal Service *lost* the mail, because Congress applied the postal exception to all "claim[s] arising out of the loss, miscarriage, or negligent transmission" of mail, describing kinds of harms, not kinds of actions by the postal workers. This interpretation is consistent with the principal provision of the FTCA, which includes losses caused by intentional misconduct and does not

require that the Government lost anything.  The Court rejects Konan's proposal to limit "loss" to only "destruction."  Ordinary speakers referred to losses of mail even when the mail was not destroyed, and the dictionary definitions Konan pointed to were listed first because they were the oldest, not because they were primary.  Pp. 8–11.

  (c) The Court rejects Konan's remaining arguments that her claims must not be barred by the postal exception.  Pp. 11–13.

    (1) Konan argues that the postal exception's "negligent transmission" category narrows the meaning of "miscarriage" and "loss," but Congress intentionally limited the "negligent" qualifier to "transmission" and did not use it to qualify "loss" or "miscarriage."  An adjective before the final noun in a list cannot be transplanted to qualify the preceding nouns.  See *Barnhart* v. *Thomas*, 540 U. S. 20, 26.  The Court does not think that the "negligent" qualifier suggests that Congress was trying to enable suits involving intentional misconduct.  Instead, the inclusion of "negligent" to qualify "transmission" forecloses claims involving mail even though nothing went wrong with its transport or delivery, keeping the focus of the postal exception on mail-delivery problems.  Pp. 11–12.

    (2) Konan also argues that the Court's interpretations of "miscarriage" and "loss" run afoul of the presumption against surplusage, because many claims—including Konan's here—will arise from both a "miscarriage" and a "loss" of mail.  But Konan's proposal to solve the surplusage—three nonoverlapping definitions of the statutory terms—is inconsistent with ordinary meaning, which shows that these terms are often used in an overlapping manner.  In *Dolan*, the Court interpreted the terms in the postal exception to substantially overlap, 546 U. S., at 487, and the canon against surplusage is subordinate to the cardinal canon that "a legislature says in a statute what it means and means in a statute what it says there," *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253–254.  Congress likely used broad, overlapping terms to better keep complaints about mail delivery out of court.  Pp. 12–13.

  (d) The Court does not decide whether all of Konan's claims are barred by the postal exception, or which arguments Konan adequately preserved.  P. 13.

96 F. 4th 799, vacated and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, KAVANAUGH, and BARRETT, JJ., joined.  SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN, GORSUCH, and JACKSON, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

---

No. 24–351

---

## UNITED STATES POSTAL SERVICE, ET AL., PETITIONERS *v.* LEBENE KONAN

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT*

[February 24, 2026]

JUSTICE THOMAS delivered the opinion of the Court.

The United States enjoys sovereign immunity and cannot be sued without its consent. By means of the Federal Tort Claims Act, Congress waived that sovereign immunity for certain tort suits based on the conduct of Government employees. See 28 U. S. C. §§2674, 1346(b). But, in the provision at issue in this case, Congress retained sovereign immunity for a wide range of claims about mail. Specifically, the FTCA's postal exception retains sovereign immunity for all claims "arising out of the loss, miscarriage, or negligent transmission of letters or postal matter." §2680(b). This case concerns whether this exception applies when postal workers intentionally fail to deliver the mail. We hold that it does.

I

A

The United States Postal Service is a frequent point of contact between citizens and the Federal Government. In 2024, the Postal Service's more than 600,000 employees delivered more than 112 billion pieces of mail—over 300 million a day—to more than 165 million delivery points. See

United States Postal Service, Fiscal Year 2024 Annual Report to Congress 3, 29, 32, 34. Unsurprisingly, given this volume, not all mail arrives properly and on time. The Postal Service reports receiving approximately 335,000 customer complaints per year. See Brief for Petitioners 24.

Because it is a Government agency, recourse against the Postal Service in the form of lawsuits for money damages is limited. As part of "the executive branch of the Government of the United States," 39 U. S. C. §201, "the Postal Service enjoys federal sovereign immunity absent a waiver," *Dolan* v. *Postal Service*, 546 U. S. 481, 484 (2006). Before 1946, that sovereign immunity generally prevented those injured by Government employees from receiving compensation through lawsuits. See *Molzof* v. *United States*, 502 U. S. 301, 304 (1992). That year, Congress enacted a "limited waiver" of immunity through the FTCA. *Id.*, at 305. Subject to enumerated exceptions, the FTCA allows a plaintiff to sue the Government for injuries or loss of property "caused by the negligent or wrongful act or omission of" a federal employee "acting within the scope of his office or employment." 28 U. S. C. §1346(b)(1).

The FTCA's postal exception retains the Government's sovereign immunity for lawsuits about failing to properly carry or deliver mail. It forecloses "[a]ny claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter." §2680(b). This Court has interpreted the postal exception to apply when the plaintiff is harmed "because mail either fails to arrive at all or arrives late, in damaged condition, or at the wrong address." *Dolan*, 546 U. S., at 489.

B

This case arises from the dismissal of a complaint, so we accept the complaint's allegations as true, although the Government disputes them. *National Rifle Association of America* v. *Vullo*, 602 U. S. 175, 181 (2024). Respondent

Lebene Konan owns two houses a block apart in Euless, Texas—one on Saratoga Drive and the other on Trenton Lane. Konan leases rooms to tenants in both houses and occasionally stays at them herself. The Postal Service delivers mail for all the houses in the neighborhood to a central structure with a box for each house. The Postal Service distributes keys to the owners of the houses so that they can retrieve their mail. As the homeowner, Konan received the keys to the boxes for both houses. Konan kept the keys and distributed the mail to her tenants daily, and she also received some of her own mail at the Saratoga address.

Konan's grievances with her mail service began in May 2020. After Konan noticed that no mail had arrived at her Saratoga house in several days, she learned that the assigned carrier had changed the listed owner from Konan's name to a tenant's name. The same carrier then authorized a change of the lock to allow the tenant to have his own mail key without Konan's consent. Konan confronted the employees at the local post office about these changes. A supervisor at the local post office explained to Konan that the Postal Service would stop delivering mail to her Saratoga address until the Postal Service Inspector General's office investigated and determined the proper owner. Konan then received no mail to the Saratoga address for a couple of months before service resumed.

Konan then learned that the same carrier had mail addressed to her and her tenants returned to senders as "undeliverable." As a result, Konan and her tenants did not receive important mail. Konan resorted to private carriers. The disruptions in mail service resulted in the loss of tenants and made it more difficult for Konan to attract new tenants. The carrier also taped a red notice inside the mailbox stating that mail addressed to some, but not all, of the Saratoga residents could be delivered to the box. In 2021, postal workers also allegedly stopped delivering mail to the

Trenton house after discovering that Konan owned it as well.

In response, Konan signed up for the Postal Service's "Informed Delivery" service, which allows customers to view scans of incoming mail. When she discovered that mail on its way to her addresses was not being delivered, she requested that the mail for the Saratoga residence be held at the post office so that she could retrieve it in person. But the postal employees did not give her the mail because Konan failed to provide identification for the addressees. In addition to these efforts, Konan also filed administrative complaints, but without success.

C

In January 2022, Konan sued the United States in federal court. Konan alleged that the Postal Service intentionally and wrongfully withheld her mail. As relevant here, Konan brought claims under state law for nuisance, tortious interference with prospective business relations, conversion, and intentional infliction of emotional distress. She sought damages for loss of rental income, the deprivation of her rightful mail, and the distress that the postal workers caused her.*

The District Court dismissed Konan's complaint based on sovereign immunity. Relying on the postal exception, it concluded that the United States enjoys sovereign immunity from her claims "because they all relate to 'personal or financial harms arising from nondelivery . . . of sensitive materials or information . . .' and other mail." 652 F. Supp. 3d 721, 731 (ND Tex. 2023) (quoting *Dolan*, 546 U. S., at

---

*Konan also brought discrimination claims against the postal workers under 42 U. S. C. §§1981 and 1985, alleging that they were motivated by racial animus. The District Court dismissed these claims. 652 F. Supp. 3d 721, 731–732 (ND Tex. 2023). The Court of Appeals affirmed. 96 F. 4th 799, 804–805 (CA5 2024). We denied Konan's cross-petition for certiorari regarding those claims, so they are not before us. 604 U. S. 1256 (2025).

489). The District Court held that the postal exception is not limited to merely negligent failure to properly carry the mail. 652 F. Supp. 3d, at 730–731.

The Court of Appeals for the Fifth Circuit reversed. It held that "the terms 'loss,' 'miscarriage,' and 'negligent transmission' do no not encompass the intentional act of not delivering the mail at all." 96 F. 4th 799, 804 (2024). It reasoned that Konan's claims did not arise out of the "loss" of mail "because the mail was not destroyed or misplaced by *unintentional* action." *Id.*, at 802 (emphasis added). It also reasoned that Konan's claims did not arise from the "miscarriage" of mail "because there was no attempt at a carriage." *Ibid.* And it reasoned that Konan's claims did not arise from the "negligent transmission" of mail because "the postal workers' actions were intentional." *Ibid.*

The Fifth Circuit's decision conflicts with those of the First and Second Circuits, which have interpreted the postal exception to apply to suits even when they arise from harms caused by intentional misconduct. See *Levasseur* v. *United States Postal Serv.*, 543 F. 3d 23, 23–24 (CA1 2008) (*per curiam*); *Marine Ins. Co.* v. *United States*, 378 F. 2d 812, 813–814 (CA2 1967). We granted certiorari to resolve the split. 604 U. S. 1256 (2025).

## II

The postal exception retains the Federal Government's sovereign immunity for "[a]ny claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter." 28 U. S. C. §2680(b). The postal exception reflects Congress's judgment that redress for "harms" of "the sort primarily identified with the Postal Service's function of transporting mail throughout the United States" should not come from tort suits. *Dolan*, 546 U. S., at 489. Given the frequency of postal workers' interactions with citizens, those suits would arise so often that they would create a significant burden for the Government and the courts. And

their cost to taxpayers would depend on the value and importance of the mail's contents, over which the Government typically has no control. See, *e.g.*, *Marine Ins. Co.*, 378 F. 2d, at 813 (theft from mail of six emeralds valued at $152,190 in 1967 dollars).

According to Konan and the dissent, the postal exception does not apply to Konan's claims because she alleges that postal workers intentionally refused to deliver her mail. We disagree. Both "miscarriage" and "loss" of mail under the postal exception can occur as a result of the Postal Service's intentional failure to deliver the mail.

A

Absent a reason to think otherwise, we interpret statutory terms according to the ordinary meanings they had when they were enacted. *Wisconsin Central Ltd.* v. *United States*, 585 U. S. 274, 277 (2018). When Congress enacted the FTCA in 1946, the "miscarriage" of mail ordinarily included any failure of mail to properly arrive at its intended destination. Konan would limit "miscarriage" to unintentional failures or failures where the mail went to the wrong address. Neither limitation is well founded.

Dictionaries published around the time Congress enacted the FTCA confirm that a "miscarriage" of mail happened when mail failed to arrive properly. Two dictionaries indicate that "miscarriage" of mail meant the "failure of a letter . . . to reach its destination." 2 New Century Dictionary of the English Language 1069 (1927); accord, 6 Oxford English Dictionary 497 (1933 ed.) ("The failure (of a letter, etc.) to reach its destination"). In a third, "miscarriage" meant the "[f]ailure (of something sent) to arrive." Webster's New International Dictionary 1568 (2d ed. 1934) (Webster's Second). Definitions of "miscarry" were similarly broad. *Ibid.* ("To fail of reaching the destination"); 6 Oxford English Dictionary, at 498 ("To fail to reach its proper destination"). Something can "fail" to happen as a result of intentional

misconduct. See, *e.g.*, 26 U. S. C. §291 (1940 ed.) (imposing a penalty for "failure to make and file [a tax] return" "unless it is shown that such failure is due to reasonable cause and not due to willful neglect"). Because a "miscarriage" includes any failure of mail to arrive properly, a person experiences a miscarriage of mail when his mail is delivered to his neighbor, held at the post office, or returned to the sender—regardless of why it happened. Konan's claims about the Postal Service's willful failure to deliver her mail therefore result from the miscarriage of her mail.

We disagree with Konan's attempt to limit "miscarriage" to *negligent* failures of mail to arrive properly. Brief for Respondent 19–20; accord, *post*, at 9 (SOTOMAYOR, J., dissenting). Neither Konan nor the dissent cites any dictionaries imposing this limitation. Instead, Konan cites examples of uses of the term "miscarriage" that suggest that the miscarriage in question was unintentional, such as an 1868 telegraph-law decision explaining that a telegraph company should not be liable "for every mistake, miscarriage, or accidental delay that may occur." *United States Tel. Co.* v. *Gildersleve*, 29 Md. 232, 246 (1868). We agree that miscarriage of mail *can* be unintentional, but "the fact that the phrase was commonly used in a particular context does not show that it is limited to that context." *District of Columbia* v. *Heller*, 554 U. S. 570, 588 (2008).

In fact, ordinary speakers used "miscarriage" to refer to problems with mail caused by intentional misconduct. When a mail pouch was "stolen," a newspaper reported that the letters "[m]iscarried." Kansas City Star, Oct. 20, 1911, p. 6A. When a priest failed to receive a summons because it was "burned by an ecclesiastic," the headline read "His Letter Miscarried." The Carbondale Leader, Jan. 3, 1893, p. 1. And when litigants' documents failed to arrive, courts classified "miscarriage" of mail as an excuse, without any suggestion as to whether the carrier acted intentionally. See, *e.g.*, *Lake* v. *Lake*, 63 Wyo. 375, 402, 182 P. 2d 824, 835

(1947) (*per curiam*); *Wagner* v. *Lucas*, 79 Okla. 231, 232–233, 193 P. 421, 422–423 (1920).  We see no reason to suppose that these uses of "miscarriage" were extraordinary.

Konan separately contends that a "miscarriage" of mail happens only when the mail goes to the "wrong address," not when it is (like her mail) held at the post office or returned to the sender.  Brief for Respondent 15.  We again decline to impose a limitation that has no basis in the dictionaries or ordinary usage.  Speakers used the term "miscarriage" when the mail failed to reach its intended destination, regardless of where it ended up.  One newspaper, for example, explained that a letter "'[m]iscarried'" because it was "'delayed.'"  Muskogee Times-Democrat, June 15, 1934, p. 1.  Another ran a story in which a correspondent's "letter miscarried and came too late."  Jersey City, N. J., The Evening Journal, June 10, 1907, p. 10.  And a court described mail mistakenly left "in the post office" as having "miscarried."  *Heinrich* v. *First Nat. Bank*, 219 N. Y. 1, 4, 6, 113 N. E. 531, 531–532 (1916).

We decline Konan's invitations to "artificially narrow ordinary meaning."  *Bartenwerfer* v. *Buckley*, 598 U. S. 69, 77 (2023).  A "miscarriage of mail" includes failure of the mail to arrive at its intended destination, regardless of the carrier's intent or where the mail goes instead.

### B

Konan's withholding claims also arise out of the "loss" of mail and are therefore within the postal exception.  28 U. S. C. §2680(b).  When Congress enacted the FTCA, the "loss" of mail ordinarily meant a deprivation of mail, regardless of how the deprivation was brought about.  So, like "miscarriage," intentional refusal to deliver mail could cause the "loss" of mail.

A "loss" of mail is a deprivation of mail.  "Loss is a generic and relative term; it is not a word of limited, hard and fast meaning."  Black's Law Dictionary 1094 (4th ed. 1968).  But

it is commonly used to refer to any "deprivation" or "that which is withheld," *id.*, at 1095, such as when someone suffers the loss of property in a fire or the loss of income from being laid off. Webster's defined "loss" as the "[a]ct or fact of losing (in various senses) or suffering deprivation." Webster's Second 1460. Oxford English Dictionary defined it as "being deprived of, or the failure to keep" something. 6 Oxford English Dictionary, at 452. One can, of course, suffer a deprivation of something when another intentionally keeps that thing for himself. Konan alleged that she was "entitled to possession" of her mail but that the Postal Service "converted" it. App. to Pet. for Cert. 58a–59a. Conversion means that Konan was "deprived of the use and possession of the property" in question. Black's Law Dictionary 421 (12th ed. 2024). Konan's claims therefore arise out of the loss of her mail.

As with "miscarriage," we disagree with Konan's attempt to limit "loss" to only inadvertent losses. See Brief for Respondent 27–28; *post*, at 6–7 (opinion of SOTOMAYOR, J.). A loss can be the result of another person's intentional misconduct. One can, for example, suffer a tax "loss" that results from "embezzlement." See, *e.g.*, *Burnet* v. *Huff*, 288 U. S. 156, 160 (1933). An army can suffer "loss" of soldiers as a result of the intentional conduct of the enemy. Funk & Wagnalls New Standard Dictionary of the English Language 1465 (1942 ed.). And, in the mail context, ordinary speakers commonly described a "loss" of mail from theft, including theft by the carrier. Just a year before Congress enacted the FTCA, the Army explained that "[v]irtually all *loss* of mail through theft occurs at terminal transfer points outside this country." Pittsfield, Mass., Berkshire Evening Eagle, Feb. 9, 1945, p. 3 (emphasis added). A few years earlier, a reported "[l]oss of [l]ocal [m]ail" was caused by a rogue "mail handler, who admitted the theft of considerable mail during the past few months." Belvidere News, Dec. 3, 1936, p. 1. Pre-FTCA decisions also described a "loss" of

mail when the carrier stole it. *E.g.*, *Boerner* v. *United States*, 117 F. 2d 387, 387–388 (CA2 1941); *Martin* v. *United States*, 280 F. 513, 514 (CA4 1922).

We also disagree with Konan's, and the dissent's, rejoinder that the postal exception applies only when the Postal Service *lost* the mail. See *post*, at 7–8. Congress could have written the postal exception to apply only when "the Postal Service lost, miscarried, or negligently transmitted" mail. But Congress applied the postal exception to all "claim[s] arising out of the loss, miscarriage, or negligent transmission" of mail. It described kinds of harms, not kinds of actions by the postal workers. See *Dolan*, 546 U. S., at 489; contra, *post*, at 4 (opinion of SOTOMAYOR, J.). We decline to rescue Konan's claims by inserting the Postal Service as the sentence's subject and then converting the three nouns into three verbs. Cf. *Terry* v. *United States*, 593 U. S. 486, 494 (2021) ("[W]e will not convert nouns to adjectives and vice versa").

Our interpretation of "loss" is also consistent with the principal provision of the FTCA. Under that provision, a plaintiff must allege a "loss of property . . . caused by the negligent or wrongful act or omission" of a federal employee. 28 U. S. C. §1346(b)(1). All agree that this provision includes losses caused by intentional misconduct and does not require that the Government "lost" anything. Because Congress used "loss" in this sense in the FTCA's principal provision, our interpretation adheres to the unrebutted presumption that "the term bears a consistent meaning throughout" the FTCA. See *Azar* v. *Allina Health Services*, 587 U. S. 566, 576 (2019).

Last, Konan proposes limiting "loss" to only "destruction." She contends that the "primary" meaning of "loss" in 1946 was "destruction," not any other kind of deprivation. Brief for Respondent 25–26. But, as we have explained, ordinary speakers referred to "losses" of mail, even when the mail was not destroyed. Judge Cardozo wrote that when an

envelope fell behind a radiator in the post office, it caused the "loss" of the checks inside even though they were later recovered. *Heinrich*, 219 N. Y., at 4, 113 N. E., at 531. And, contemporaneous regulations treated "loss" and "destruction" separately, not, as Konan suggests, synonymously. See, *e.g.*, Postal Laws and Regulations §159 (1940 ed.) (delaying certain procedures until officials have "determined that such loss, destruction, or damage resulted from no fault or negligence on the part of" a postmaster). Konan asserts that "destruction" was the "primary" meaning of loss because it was listed as the first definition in dictionaries. Brief for Respondent 25–26. But, "[a]lthough many people assume that the first sense listed in a dictionary is the 'main' sense, that is often quite untrue." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 418 (2012). The definitions Konan pointed to were listed first because they were the oldest, not because they were primary. See 1 Oxford English Dictionary, at xxxi ("[T]hat sense is placed first which was actually the earliest in the language . . . "); 1 New Century Dictionary, at iii ("In general, the senses of each word are arranged, as far as possible, in the order of their derivation and development from the original source . . . "); Webster's New International Dictionary ix (1927) (following "[t]he principle of historical arrangement followed in the earlier editions"). We do not presume that Congress intended the *oldest* usage, but rather the ordinary one in 1946, and contemporaneous evidence shows that Konan's usage was not the primary one.

## III

Konan proffers two remaining arguments that her claims must not be barred by the postal exception. We address them in turn.

First, Konan argues that the postal exception's "negligent transmission" category narrows the meaning of "miscarriage" and "loss." She argues that the qualifier "negligent"

in the term "negligent transmission" implicitly qualifies the
other two terms. But Congress intentionally limited the
"negligent" qualifier to "transmission" and did not use it to
qualify "loss" or "miscarriage." Konan's "argument seems
to assume that pairing a broad statutory term with a nar-
row one shrinks the broad one, but there is no such general
usage." *S. D. Warren Co.* v. *Maine Bd. of Environmental
Protection*, 547 U. S. 370, 379 (2006). Just like "a limiting
clause or phrase . . . should ordinarily be read as modifying
only the noun or phrase that it immediately follows," an ad-
jective before the final noun in a list cannot be transplanted
to qualify the preceding nouns. *Barnhart* v. *Thomas*, 540
U. S. 20, 26 (2003). We also do not think that the "negli-
gent" qualifier suggests that Congress was trying to enable
suits involving intentional misconduct. Contra, *post*, at 5–
6 (opinion of SOTOMAYOR, J.). If Congress had written the
postal exception to refer to all "transmission" of mail, the
category—unlike "miscarriage" and "loss"—would have en-
compassed claims that involved mail even though nothing
went wrong with its transport or delivery. See *Dolan*, 546
U. S., at 486 (acknowledging the broad meaning of "trans-
mission" in isolation). The inclusion of "negligent" to qual-
ify "transmission" forecloses that result and thereby keeps
the focus of the postal exception on mail-delivery problems,
but, in doing so, it does not limit the other two categories.

Second, Konan argues that our interpretations of "mis-
carriage" and "loss" run afoul of the presumption against
surplusage. On our interpretation, she argues, many
claims—including Konan's here—will arise from both a
"miscarriage" and a "loss" of mail, making one or the other
redundant. To solve the surplusage, Konan proposes three
nonoverlapping definitions: "Loss" covers "damage" to mail;
"miscarriage" covers "what happens" to mail "when it leaves
the USPS's custody and ends up in the wrong place"; and
"negligent transmission" covers "detention or delays of the
mail while still in the USPS's possession." Brief for

Respondent 9. Konan's proposal is inconsistent with ordinary meaning, which shows that these terms were often used in an overlapping manner. See, *e.g.*, *Heinrich*, 219 N. Y., at 4–6, 113 N. E., at 531–532 (describing "[t]he loss of the checks" that "miscarried in the mails"); *Brevard* v. *Wimberly*, 89 Mo. App. 331, 338–339 (1901) ("miscarriage of . . . packages" could lead to "the loss of a registered package"). And, in *Dolan*, the Court interpreted the terms in the postal exception to substantially overlap. See 546 U. S., at 487. The canon against surplusage is subordinate to the "cardinal canon" that "a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253–254 (1992). We think that Congress likely used broad, overlapping terms to better keep complaints about mail delivery out of court.

## IV

We hold that the postal exception covers suits against the United States for the intentional nondelivery of mail. We do not decide whether all of Konan's claims are barred by the postal exception, or which arguments Konan adequately preserved. We vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 24–351

UNITED STATES POSTAL SERVICE, ET AL.,
PETITIONER *v.* LEBENE KONAN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[February 24, 2026]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN, JUSTICE GORSUCH, and JUSTICE JACKSON join, dissenting.

For two years, respondent Lebene Konan and her tenants did not receive mail addressed to the rental properties that Konan owned. According to Konan, negligence was not to blame. Quite the opposite: She alleges that United States Postal Service employees intentionally withheld delivery because they did not like "'that a black person own[ed]'" the properties and "'lease[d] rooms . . . to white people.'" 652 F. Supp. 3d 721, 725 (ND Tex. 2023).

Konan brought this action under the Federal Tort Claims Act (FTCA) against the United States to recover damages she sustained as a result of this alleged years-long harassment campaign. The United States is generally protected by sovereign immunity, but Congress, through the FTCA, has enacted a capacious waiver of that immunity for tort suits when an individual is harmed by a federal employee acting within the scope of her employment. That waiver, however, is subject to several exceptions. Today, the Court holds that one exception—the postal exception—prevents individuals from recovering for injuries based on a postal employee's intentional misconduct, including when an employee maliciously withholds their mail. Because this reading of the postal exception transforms, rather than honors, the exception Congress enacted, I respectfully dissent.

## I

The FTCA serves a simple purpose: "'to remove the sovereign immunity of the United States from suits in tort.'" *Levin* v. *United States*, 568 U. S. 503, 506 (2013). This "broad waiver" of immunity, *Millbrook* v. *United States*, 569 U. S. 50, 52 (2013), allows an individual harmed by a federal employee "acting within the scope of his office or employment" to recover for "injury or loss of property, or personal injury or death caused by the" employee's "negligent or wrongful act or omission," 28 U. S. C. §1346(b)(1); see *United States* v. *Yellow Cab Co.*, 340 U. S. 543, 547 (1951) (describing the waiver as "sweeping").

Congress has also enacted several exceptions preserving the United States' immunity in some circumstances. See §2680 (listing 13 such exceptions). The exceptions "are designed to protect certain important governmental functions and prerogatives from disruption." *Molzof* v. *United States*, 502 U. S. 301, 311 (1992). They thus "mark the 'boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'" *Ibid.*

At the same time, courts must be careful not to interpret these exceptions too broadly. "'[U]nduly generous interpretations,'" this Court has warned, "'run the risk of defeating the central purpose of the statute'"—to "'waiv[e] the Government's immunity from suit in sweeping language.'" *Dolan* v. *Postal Service*, 546 U. S. 481, 492 (2006) (quoting *Kosak* v. *United States*, 465 U. S. 848, 853, n. 9 (1984); *Yellow Cab*, 340 U. S., at 547). To harmonize these considerations, "'the proper objective of a court attempting to construe one of the'" exceptions "'is to identify those circumstances which are within the words and reason of the exception—no less and no more.'" *Dolan*, 546 U. S., at 492 (quoting *Kosak*, 465 U. S., at 853–854, n. 9 (some internal quotation marks omitted)).

This case calls on the Court to interpret the postal exception, which covers "[a]ny claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter." §2680(b). The wording of this exception is noticeably narrower than some of its neighbors. For example, all claims for "damages caused by the fiscal operations of the Treasury or by the regulation of the monetary system" are barred. §2680(i). So too are all "claim[s] arising from the activities of the Tennessee Valley Authority," the "Panama Canal Company," and "a Federal Bank, a Federal intermediate credit bank, or a bank for cooperatives," §§2680(*l*), (m), (n).

By comparison, Congress did not paint with as broad of a brush in designing the postal exception. Like it had for these other agencies and activities, Congress could have granted immunity for all "claims arising from the mail activities of the Postal Service." Instead, Congress identified certain "misconduct for which the Government was not assuming financial responsibility—namely, 'the loss, miscarriage, or negligent transmission of letters or postal matter.'" *Kosak*, 465 U. S., at 855. By using "specificity" over "generality," it follows that Congress intended for this exception "to be *less* encompassing" than the coverage provided by the broader exceptions, and for the Government to "assum[e] financial responsibility" for certain classes of "misconduct" related to postal activities. *Ibid.*

This Court has already identified some of those classes. In *Kosak*, the Court explained that claims arising from car accidents caused by postal employees delivering mail fall outside the exception. *Ibid.* In *Dolan*, the Court recognized a second class of claims for slip and falls caused by an employee negligently placing a package on a porch step. 546 U. S., at 483. Today, I would have affirmed the Fifth Circuit's well-reasoned decision that acknowledged a third class: claims concerning intentional misconduct committed

by postal employees, which would necessarily include withholding a person's mail for malicious reasons.

## II
## A

The postal exception's text shows that Congress did not intend to immunize intentional misconduct. Recall that the exception covers the "loss," "miscarriage," and "negligent transmission" of mail. §2680(b). As *Kosak* observed, the terms describe three categories of "misconduct" that postal employees can commit without incurring liability for the United States. 465 U. S., at 855. The majority, however, contends that these terms focus on "harms" rather than Government wrongdoing, citing *Dolan*. *Ante,* at 2, 5, 10. To be sure, *Dolan* described these terms as "harm[s]," but in the same breath, it also emphasized that the three terms protect "only a subset of postal wrongdoing." 546 U. S., at 490.

A focus on misconduct is consistent with most other FTCA exceptions, which generally are triggered by certain types of Government conduct, rather than the type of harm the plaintiff experiences. For instance, some exceptions directly cover different "act[s] or omission[s]" of Government employees, §§2680(a) (discretionary acts), (e) (administering §§1–31 of Title 50). Another addresses intentional actions by employees, capturing, for example, assault, battery, false imprisonment, and other intentional torts like them. §2680(h). A different group immunizes the "activities" of a given Government instrumentality. §§2680(j), (*l*), (m), (n). Yet a different subset describes a specific type of Government action, such as the "assessment or collection of any tax or customs duty," §2680(c), the "imposition or establishment of a quarantine," §2680(f), and the "fiscal operations of the Treasury," §2680(i). The focus of each is on the Government conduct. The same is necessarily true of the postal exception.

The key question is thus as follows: What kind of misconduct falls within the "'words and reason'" of the postal exception? *Dolan*, 546 U. S., at 492 (quoting *Kosak*, 465 U. S., at 854, n. 9). All signs point to Congress leaving intentional misconduct outside of the exception's scope.

1

Begin with "negligent transmission." This term covers "negligence causing mail to be lost or to arrive late, in damaged condition, or at the wrong address." *Dolan*, 546 U. S., at 486. It goes without saying that this term therefore does not immunize intentional misconduct.

Beyond that basic insight, however, Congress's express inclusion of "negligent transmission" provides other important clues for deciphering statutory meaning about the scope of the postal exception. As the majority recognizes, if Congress had included all claims arising out of the "transmission" of mail in the postal exception, the term "would have encompassed claims that involved mail even though nothing went wrong with its transport or delivery." *Ante,* at 12. To avoid that outcome, Congress needed to add a narrowing modifier to focus on when things go wrong.[1]

Critically, Congress did not have to choose "negligent" as that modifier (or the only modifier). Congress could have, for example, modified "transmission" with both "negligent" and "wrongful." Doing so would have avoided the problem the majority identifies while also clarifying that both classes of conduct fall within the exception's scope. Yet Congress elected to immunize negligent conduct alone. Its choice to do so carries significance. It raises the natural inference that Congress intended for at least some intentional wrongdoing related to transmitting mail to fall outside the scope of the exception.

––––––––––

[1] Congress did not need to add "negligent" before "miscarriage" or "loss" because the ordinary meaning of those terms, plus statutory context, convey inadvertence on their own. See *infra*, at 6–12.

Indeed, before this Court, the Government emphasizes repeatedly that "negligent transmission" is "significant" because the term "shows that Congress knew how to exclude intentional conduct when it wanted to."  Brief for Petitioners 3, 17, 35.  Yet, according to the Government and the majority, this was a hollow choice.  In their view, Congress excluded some set of intentional conduct through the "negligent transmission" modifier only to sweep that conduct back into the exception through "miscarriage" and "loss." The majority adopts the Government's definition of "miscarriage" as capturing situations where "mail fail[s] to arrive properly," regardless of the actor's intent.  *Ante,* at 6. It also adopts the Government's definition of "loss" as capturing the "deprivation of mail," regardless, again, of the depriver's intent.  *Ante,* at 8.  It is difficult to see how a postal employee could intentionally transmit mail wrongfully—such as by refusing to deliver the mail, lighting it on fire, or shredding it into pieces—without falling within these definitions of "miscarriage" or "loss."  In this world, Congress did not even need to bother with the modifier to transmission that it adopted.

Congress did not make this odd choice.  As explained below, "loss" and "miscarriage," as used in the postal exception, do not capture intentional misconduct either.

2

Turn, then, to "loss."  As the Government acknowledged in its petition for certiorari, "loss" is ordinarily understood to capture unintentional conduct.  Pet. for Cert. 14; see also Webster's New International Dictionary 1460 (2d ed. 1934) (defining "loss" as an "[a]ct or fact of losing . . . esp[ecially], unintentional parting with something of value").  For good reason: As the Fifth Circuit observed below, "no one intentionally loses something."  96 F. 4th 799, 802 (2024).  People lose their keys when they misplace them, not when they give them to their children.  People lose their mail when it

gets stuck behind a drawer, not when they intentionally throw it away. If someone said that they "lost" their car, no one would think it was stolen, only that the person forgot where they had parked it. The same is true when the Postal Service loses someone's mail. The reason is an error, not deliberate wrongdoing.

To reach its contrary result, the majority defines "loss" as any "deprivation of mail," which it concludes captures all situations where the individual does not receive mail, no matter the cause. *Ante,* at 8. To do so, however, the majority must shift away from a focus on harms that befall the mail to harms that befall Konan. The majority says that the postal exception encompasses three "kinds of harms, not kinds of actions by the postal workers." *Ante,* at 10. The majority defines the first two terms, "miscarriage" and "negligent transmission," to encompass "harms" to the mail. Yet, under the majority's interpretation, "loss" is an entirely distinct kind of "harm." That is because the mail does not "suffer a deprivation" in the same way that mail fails to arrive (miscarriage) or mail is damaged due to negligence (negligent transmission). The only way "loss" could mean a "deprivation" is if it were a harm experienced by Konan, not by the mail. No such inconsistency, however, arises if (as explained above) all three terms are read to refer to the Government's misconduct: the Postal Service's loss, miscarriage, or negligent transmission of mail. See *supra*, at 4–5. When used in this sense, "loss" plainly and sensibly denotes unintentional conduct, consistent with its ordinary meaning.[2]

_____

[2] The Government also contends that "loss" in the postal exception incorporates intentional misconduct because it asks "whether the alleged victims 'lost' mail." Brief for Petitioners 41 (emphasis deleted); Tr. of Oral Arg. 21 (same). That again requires the same shift in perspective: asking, on one hand, whether mail was "miscarr[ied]" or "negligently transmitted" by the Postal Service, and, on the other hand, whether Konan "los[t]" (and so was deprived of) her mail.

The majority also invokes the presumption of consistent usage. It points to the use of "loss" in the FTCA's sovereign immunity waiver as meaning "deprivation," and argues that "loss" as used in the postal exception must take on the same meaning. *Ante,* at 10. The consistent-usage canon, however, "'readily yields' to context," *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 320 (2014), and here, comparing the context of the FTCA's waiver to the context of the postal exception shows that "loss" is being used in two different ways.

The waiver uses "loss" to describe the form of damages an individual harmed by a federal employee can seek to recover. It states that plaintiffs can bring claims against the United States for "loss of property" "caused by the negligent or wrongful act or omission of any employee of the Government" while acting within the scope of their employment. §1346(b)(1). The plaintiff's "loss" could be due to "negligent or wrongful" conduct, as the waiver states explicitly. *Ibid.* In contrast, the postal exception uses "loss" to describe the form of the employee's misconduct that is protected from liability. If an employee lost the mail, the plaintiff suffered a "loss" under the waiver and the claim arose "out of the loss" of the mail, meaning the postal exception applies. If an employee intentionally destroyed the mail, the waiver would still be implicated because the plaintiff suffered a relevant "loss" for purposes of the waiver. The postal exception would not apply, however, because the employee destroyed the mail and did not lose it. "Loss" is thus being clearly used in two different ways and carries two different meanings.

### 3

That brings us to "miscarriage." The majority is correct that "miscarriage" covers misconduct by the Postal Service that causes mail to "fai[l] to arrive properly," *ante,* at 6, but

the majority is wrong to extend this meaning to cover situations that involve intentional misconduct.

As the majority recognizes, "miscarriage" commonly covers negligence or inadvertence. *Ante,* at 7. Indeed, there are many examples of "miscarriage" being used when mail "fails to arrive" due to negligence, including as illustrated by the Government's own cases. See, *e.g.*, *Heinrich* v. *First Nat. Bank*, 219 N. Y. 1, 113 N. E. 531, 531–532 (1916); *Elam* v. *St. Louis & S. F. R. Co.*, 117 Mo. App. 453, 93 S. W. 851 (1906); see n. 3, *infra.* From here, as the majority sees it, mail that is intentionally not delivered, even for malicious reasons, also "failed to arrive properly," so Congress must have intended to include intentional misconduct within the exception by using "miscarriage." *Ante,* at 6. The majority, however, offers no persuasive evidence suggesting that "miscarriage" is commonly used in this way.

To start, the majority relies on several dictionary definitions. *Ante,* at 6–7. None of those definitions addresses an individual's *mens rea.* The phrase "failure to arrive," moreover, does not immediately suggest intentional wrongdoing. "A diplomat might 'fail to arrive' at a treaty negotiation if her flight were cancelled, but no one would describe her as 'failing to arrive' if she deliberately skipped the talks to undermine the treaty ('refused to attend' would be more accurate)." Brief for Respondent 23.

Next, the majority turns to real-life examples. Here, the majority does not rely on any cases cited by the Government. That is not a surprise, as the Government failed to identify a single example of "miscarriage" being used to describe mail "failing to arrive properly" due to intentional misconduct.[3] The majority thus searches elsewhere, citing

--------

[3] See Reply Brief 8–10 (citing *Bowen* v. *Wilson*, 15 F. 2d 733, 734 (DC 1926) ("miscarriage" when delivery was attempted but returned because the recipient could not be found); *Heinrich* v. *First Nat. Bank*, 219 N. Y. 1, 113 N. E. 531, 531–532 (1916) (mail was "miscarried" when it was misplaced behind a radiator due to "the negligence of employees of the post-

examples of its own: two cherry-picked newspaper references almost 20 years apart, and at least 30 years before the enactment of the FTCA, that used "miscarried," not "miscarriage." *Ante,* at 7–8. If "miscarriage" were in fact ordinarily used to describe intentional misconduct, one might expect that actual examples of the usage would be easier to come by.

The majority also cites cases in which the reason behind a "miscarriage" was not identified, but those cases do not support its position. *Ante,* at 7–8. How a word is used when the cause is unknown hardly informs whether an ordinary speaker would use the same word when the cause is known. Those cases, moreover, simply reflect the general presumption that issues with mail are typically not a result of intentional misconduct by postal workers. For example, in *Lake* v. *Lake*, 63 Wyo. 375, 182 P. 2d 824 (1947) (*per curiam*), the court explained that when a motion arrived in court "a day too late" due to a "miscarriage of the mails," with no further cause explained, that "'mere accident'" should not be held against the party. *Id.*, at 402, 182 P. 2d, at 835. Similarly, in *Wagner* v. *Lucas*, 79 Okla. 231, 193 P. 421 (1920), the court described "miscarriage of the mails" as a situation that "human prudence, foresight, and sagacity . . . could not

_____

office"); *Southern Express Co.* v. *Hill*, 81 Ark. 1, 98 S. W. 371, 372–373 (1906) ("miscarriage" due to the sender mistakenly writing the wrong address); *Elam* v. *St. Louis & S. F. R.* Co., 117 Mo. App. 453, 93 S. W. 851 (1906) ("miscarriage" due to the "negligence" of the postal carrier); *Western Home Ins. Co.* v. *Richardson*, 40 Neb. 1, 58 N. W. 597, 598 (1894) (cause unknown); *Fosters* v. *McKibben*, 14 Pa. 168, 170 (1850) (describing a letter that "miscarrie[s] for want of publication"); *People ex rel. Holdsworth* v. *Superior Ct.*, 18 Wend. 675, 678 (N. Y. Sup. Ct. 1837) (cause unknown)). See also *Missouri, K. & T. R. Co.* v. *Ellis*, 53 Okla. 264, 156 P. 226, 228 (1916) (although the cause of the mail arriving late was unknown, the court referred to the "miscarriage of the mail" as an "accident"); *Kellogg* v. *Smith*, 171 Okla. 355, 42 P. 2d 493, 495 (1935) (*per curiam*) (similar); *Hogan* v. *Bailey*, 27 Okla. 15, 110 P. 890, 891 (1910) (similar); *Chichester* v. *Cande*, 3 Cow. 39, 48 (N. Y. Sup. Ct. 1824) (similar).

prevent," like a "mistake in the wording of a telegram." *Id.*, at 232–233, 193 P., at 423. Accordingly, the use of the term "miscarriage" in these cases does not prove that the term covers intentional misconduct; in context, had the courts suspected that the late delivery, for instance, was a result of such misconduct, they likely would have used a different word.

The contemporaneous Postal Laws and Regulations from before the FTCA was enacted—the "backdrop" against which "Congress enacted the postal exception," Brief for Petitioners 35—further undermine the majority's interpretation. For example, those regulations directed the Division of Stamps to make adjustments in "cases of loss, miscarriage, or detention of stamped supplies in transit." Post Office Dept., Postal Law & Regs. §13.6 (1940 ed.). This suggests that when the stamped supplies were intentionally held back and not delivered (*i.e.*, failed to arrive), "detention" was used instead of "miscarriage," even though, on the majority's reading, "miscarriage" would have sufficed. The regulations also directed postal employees to "hold" packages dropped off for "forwarding" if they contained "destructive mail matter," to "notify the sender" of the "detention of the package," and to let them know it cannot be "transported by mail." §728. This is another use of "detention" in the context where, under the majority's view, "miscarriage" would have been appropriate because the mail "failed to arrive" at its destination. Yet, in each, the cause of the nondelivery was known, it was not inadvertence, and a different term was used.

At most, the majority shows that certain dictionary definitions of "miscarriage" could conceivably capture intentionally withholding mail, or tearing up a letter into pieces, or lighting a package on fire—in all those situations, the mail "failed to arrive properly." *Ante,* at 6. "That a definition is broad enough to encompass one sense of a word," however, "does not establish that the word is *ordinarily*

understood in that sense." *Taniguchi* v. *Kan Pacific Sai-
pan, Ltd.*, 566 U. S. 560, 568 (2012). Here, neither the ma-
jority nor the Government has offered any meaningful evi-
dence supporting the view that "miscarriage" was
commonly used in situations when the mail failed to arrive
properly due to intentional wrongdoing, and that, by includ-
ing "miscarriage" within the postal exception, Congress in-
tended to capture such wrongdoing.

If there were any doubt, the words surrounding "miscar-
riage" resolve it. As the Court in *Dolan* explained, when
construed in context, "[a] word in a statute may or may not
extend to the outer limits of its definitional possibilities."
546 U. S., at 486. For example, "'[a] word is known by the
company it keeps,'" and "'[w]ords grouped in a list should
be given related meaning.'" *Id.*, at 486–487. Without this
rule, courts risk "'ascribing to one word a meaning so broad
that it is inconsistent with its accompanying words, thus
giving unintended breadth to the Acts of Congress.'" *Yates*
v. *United States*, 574 U. S. 528, 543 (2015) (plurality opin-
ion).

Here, reading "miscarriage" to capture intentional mis-
conduct does precisely that. As noted above, the word "loss"
typically connotes negligence, see *supra*, at 6–7, and the
majority's reading makes Congress's specific inclusion of
the "negligent" modifier for "transmission" entirely ineffec-
tive at serving its purpose—excluding intentional miscon-
duct. See *supra*, at 5–6. There also does not appear to be
any good reason why Congress would have wanted one term
("miscarriage," alone) to cover intentional misconduct and
not the other two terms. Indeed, under the majority's broad
definition of "miscarriage," the words "loss" and "negligent
transmission" become no more than "misleading surplus-
age." *Yates*, 574 U. S., at 546.

## B

For all these reasons, a faithful interpretation of the postal exception leads to the conclusion that intentional misconduct is excluded from its reach. Congress used "overlapping" terms in the exception, *ante,* at 13, but Congress intended for that overlap to keep claims alleging negligence, not intentional wrongdoing, out of court. This reading gives meaning to Congress's choice to put "negligent" before "transmission" and to use the words "miscarriage" and "loss" in their common understanding, and it respects the "specificity" Congress used in the postal exception as compared to the broadly worded exceptions Congress used for other agencies. *Kosak*, 465 U. S., at 855.

Undeterred by this evidence, the majority gives the Postal Service the blanket exception Congress withheld. In its view, the exception immunizes the agency for all intentional and nonintentional actions in the delivery of mail (apart from auto accidents and slip and falls, as *Dolan* and *Kosak* require). Relying on "loss, miscarriage, and negligent transmission" is an odd way to cover this waterfront. If Congress had intended this outcome, why not follow the same approach that it used for other broad exceptions in the FTCA? See *supra*, at 3. The answer is that Congress intended no such thing. By expanding the "words and reason" of the postal exception beyond their "specifi[c]" scope, *Kosak*, 565 U. S., at 855, the majority undermines the "'sweeping'" waiver of immunity Congress adopted, *Dolan*, 546 U. S., at 492.

Contrary to the majority's suggestion otherwise, adhering to the text Congress enacted would not flood the Government or courts with frivolous lawsuits.[4] That is because

_____

[4] The majority points to the 335,000 complaints filed with the Postal Service each year to suggest that those claims arise out of mail failing to "arriv[e] properly and on time." *Ante,* at 2. This is misleading. As Konan explains, those complaints include "everything from '[r]ude or unprofessional . . . employee behavior' to '[c]omplaints about . . . vehicle parking.'"

the FTCA has additional safeguards that bar many claims premised on intentional misconduct. Liability for the United States will arise only in the rare situation in which the employee's intentional conduct is tortious, falls within the scope of her employment, and falls outside of the due-care and discretionary-function exceptions. See 28 U. S. C. §2680(a). For example, the majority cites one case of an insurance company suing after a federal employee stole an expensive package it had insured, see *ante*, at 6, but most States likely do not consider intentional torts like theft to fall within an individual's scope of employment, see Restatement (Second) of Agency §228 (1957) (torts fall outside the scope of employment when they are "too little actuated by a purpose to serve" the employer); Brief for Respondent 43, n. 21 (collecting cases where theft fell outside the scope of employment). The United States, accordingly, would not incur liability in those circumstances or others involving claims of similar misconduct.

In addition, there are ordinary litigation tools to prevent any threat of abuses, from Rule 11 of the Federal Rules of Civil Procedure to the plausibility standards in *Bell Atlantic Corp.* v. *Twombly*, 550 U. S. 544 (2007)*,* and *Ashcroft* v. *Iqbal*, 556 U. S. 662 (2009). These tools suffice in many other circumstances where the threats of disruption posed by large volumes of litigation are also high. Other exceptions, like the intentional-tort exception, §2680(h), and the due-care exception, §2680(a), turn on Government officials' *mens rea*, and courts are well equipped to assess the plausibility of any given case based on the facts before them.

_____

Brief for Respondent 43. Submitting a "'customer complaint,'" moreover, requires "typing a few sentences into an online form," whereas "[f]iling an FTCA claim requires first exhausting administrative remedies and then filing suit in court." *Ibid*. The raw number of complaints therefore does not provide an accurate gauge of the consequences for recognizing that intentional misconduct does not fall within the postal exception.

Finally, even if ruling for Konan today would mean more suits against the Government for mail-related intentional torts tomorrow, that would not provide this Court with authority to change the text Congress enacted. Ultimately, this regime is the consequence of Congress's choice to have the exception turn on certain types of misconduct, rather than providing the Postal Service with a blanket exception. It is not the role of the Judiciary to supplant the choice Congress made because it would have chosen differently.

\*   \*   \*

Today, the majority concludes that the postal exception captures, and therefore protects, the intentional nondelivery of mail, even when that nondelivery was driven by malicious reasons. Because this interpretation expands the scope of the exception beyond what it can reasonably support, and undermines the FTCA's sweeping waiver in the process, I respectfully dissent.